# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NEW COLT HOLDING CORP., ET AL | : | Case No: 3:02cv173 (PCD) |
| Plaintiffs | : | |
| | : | |
| vs. | : | |
| | : | |
| | : | |
| RJG HOLDINGS OF FLORIDA, INC., | : | |
| ET AL | : | |
| Defendants | : | |

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Plaintiffs and Defendants have filed cross-motions for summary judgment. For the reasons stated herein, Plaintiffs' Motion [Doc. No. 157] is **granted** in part, **denied** in part and Defendants' Motion [Doc. No. 144] is **granted** in part, **denied** in part. Additionally, Defendants' Motions to Strike [Doc. Nos. 186 and 193] are **denied**.

## I.    BACKGROUND:

Plaintiffs New Colt Holding Corporation and Colt's Manufacturing Company, Inc. brought this action against RJG Holdings of Florida, Inc f/k/a American Western Arms and AWA International, Inc. t/a American Western Arms alleging violations of the Lanham Act. 15 U.S.C. § 1051, et seq. (LEXIS 2004) and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §42-110b(a) (LEXIS 2004). Pursuant to Sections 32, 43(a), and (c) of the Lanham Act, 15 U.S.C. §§ 114, 1125(a), and (c), Plaintiffs allege infringement of the trade dress of their Peacemaker revolver (Count One), dilution of the trade dress of the Peacemaker revolver (Count Two), infringement of their registered trademarks "Peacekeeper"

(Count Three) and "Rampant Colt (Count Four), infringement of Plaintiffs' unregistered marks "Peacekeeper" (Count Five) and "Armsear Crest" (Count Six), federal unfair competition (Count Seven), and unfair competition under state law pursuant to the CUTPA, Conn. Genn. Stat. §42-110b(a) (Count Eight).

Defendant AWA asserts five counterclaims against Plaintiffs. Pursuant to the Lanham Act, 15 U.S.C. § 1125(a)(1), Defendant AWA alleges false designation of origin claims as to whether Plaintiffs' Cowboy revolver is manufactured in the USA and false advertising concerning historical significance (First Counterclaim). Defendant AWA also alleges false designation of origin in as much as Plaintiffs mark their revolvers as manufactured in Hartford, Connecticut (Second Counterclaim). A violation of the CUTPA, Conn. Gen. Stat. § 42-110a et seq, is asserted when Plaintiffs filed a letter of protest with respect to Defendant's attempt at registration of the mark "Peacekeeper" (Third Counterclaim). Finally, it is alleged that the name "Single Action Army" and Plaintiffs' alleged trade dress have either been abandoned or become generic (Fourth and Fifth Counterclaims).

The majority of the relevant facts will be discussed as necessary in the substance of this Ruling, however, some background is necessary.[1] Plaintiff New Colt Holding Corp. is a corporation organized and existing under the laws of Delaware with its principal place of business in New York, NY. New Colt is the parent company of Plaintiff Colt's Manufacturing Company, Inc., which is a corporation organized and existing under the laws of the Delaware with a corporate address in Hartford, CT. Defendant RJG Holdings of Florida, Inc. is a

---

[1]     Unless otherwise noted, the facts are taken from the parties' Local Rule 56(a) statements of material facts not in dispute.

corporation organized and existing under the laws of Florida.  Defendant AWA International, Inc. is a corporation organized and existing under the laws of Florida with its principal place of business in Delray Beach, FL.  In October 2000, Defendant AWA assumed the operations of Defendant RJG.

In 1872, Colt's Fire Arms began manufacturing the Model 1873 revolver, also known as the Peacemaker, Single Action Army, and/or the Model P.  The introduction of the revolver was successful and by the end of the year, the United States Army adopted it as its standard issue.  It is the appearance of this revolver, which Plaintiffs argue remains basically unchanged in its present day instantiation, that Plaintiffs claim as their trade dress.

The revolver was continuously manufactured until 1941 when production of the revolver was halted.  Plaintiffs claim this was necessary in order to dedicate their production facilities to manufacturing arms for World War II.  Defendants contend production stopped because the revolvers were no longer selling well.  Nonetheless, after approximately 14 years of non-production, manufacture of the Peacemaker resumed in late 1955.  The revolvers produced after 1955 are typically referred to as Second Generation Peacemakers.

Production was again continuous until 1976 when the revolver was retooled once more.  Revolvers produced after this retooling are referred to as Third Generation Peacemakers, which are produced to this day.  Plaintiffs contend that the differences between the three generations of revolvers are negligible and that the overall appearance and trade dress remain virtually unchanged.  Defendants allege there have been significant changes and that the trade dress is not the same.  It is agreed, however, that since 1873 virtually all of Plaintiffs' revolvers have had the name address, either in full or abbreviated, - "Colt's Patent Firearms Manufacturing Company,

3

Hartford Connecticut USA" - stamped as a rollmark on the barrel of the revolver.  Moreover, since 1956 Plaintiffs have been competing with various manufacturers of replicas of the Peacemaker revolver.

Defendant RJG formerly known as American Western Arms was incorporated for the purpose of manufacturing replica Peacemaker revolvers.  Its president, Robert Gangi, sought to manufacture the most accurate replicas of First Generation Peacemakers on the market.  Mr. Gangi decided to offer two models for sale which were based on the Armi San Marco revolver - another replica.  One of the revolvers offered was the Peacekeeper revolver which is an extremely accurate replica of the First Generation Model P.  The other revolver is closer to the Armi San Marco revolver and known as the Longhorn.  Defendants allege that Mr. Gangi made numerous attempts to obtain a licensing agreement from Plaintiffs.  After those efforts failed, the first sales of Mr. Gangi's replicas were made in June of 2000.  Shortly thereafter, the assets of his company were sold to AWA International.  Plaintiffs filed this lawsuit in January 2002.

Plaintiffs' Peacemaker revolver retails for well over $1,000.  Plaintiffs also market the "Cowboy" revolver, which they refer to as an "economy version" of the Peacemaker.  It retails for approximately $700.

Plaintiffs produced a Peacekeeper revolver from approximately 1985 through 1988.  It was not a western style revolver and marketed towards law enforcement and home defense.  Plaintiffs contend that they still provide repair services for the revolver.

"The Rampant Colt" is a registered trademark of Plaintiffs'.  It is a picture of a horse rearing up with a spear between its forelegs and another in its mouth.  It often appears on the grips of Plaintiffs' revolvers inside an oval.  Plaintiffs contend that they have been using some

form of the Rampant Colt logo since 1836 and that it has appeared on the grips of Plaintiffs' revolvers since approximately 1897.  The Rampant Colt also appears in connection with Plaintiffs' other firearms and related accessories.

Plaintiffs' Armsmear Crest is the family crest of Colt's founder Samuel Colt.  It pictures a horse similar in appearance to the horse visible in the Rampant Colt mark.

Defendants place a logo of a horse on their revolver grips.  This logo involves a running horse, as opposed to rearing up, and does not picture any spears, but is inside an oval and appears in a similar location on Defendants' revolvers.  Defendants contend that the logo was designed without reference to Plaintiffs'.

## II.    STANDARD OF REVIEW:

A party moving for summary judgment must establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  "A party opposing a properly brought motion for summary judgment bears the burden of going beyond the pleadings, and 'designating specific facts showing that there is a genuine issue for trial.'" Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470 (2d Cir. 2002), citing Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the nonmoving party's claim."  Legg v. Dellavolpe, 228 F. Supp. 2d 51, 56 (D. Conn. 2002), citing Celotex, 477 U.S. at 322.  In determining whether a genuine issue has been raised, all

ambiguities are resolved and all reasonable inferences are drawn against the moving party.

United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962); Quinn

v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980).  Summary judgment

is proper when reasonable minds could not differ as to the import of evidence.  Bryant v.

Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  "Conclusory allegations will not suffice to create a

genuine issue." Delaware & H. R. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990).

Determinations of the weight to accord evidence or credibility of witnesses are improper on a

motion for summary judgment as such are within the sole province of the jury.  Hayes v. N.Y.

City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).

## III.    DISCUSSION:[2]

### A.    Plaintiffs' Trade Dress Claims:

Counts One, Two, Seven, and Eight deal with claims for relief based on Plaintiffs' alleged

trade dress.  Defendants move for summary judgment on each of these counts.[3]  Defendants'

Motion is **denied** for the reasons stated herein.

---

[2]    It bears mentioning at the outset that the hostility evident in both parties' briefs is entirely
inappropriate and unprofessional.  Referring to another party's argument as preposterous,
ludicrous, absurd, or anything similar does nothing to advance rational discussion of an issue or aid
in its resolution.  In fact, such language has the tendency to discredit rather than bolster legal
arguments.

[3]    Count Eight asserts a violation of the CUTPA.  Defendants do not make any arguments tailored to
the CUTPA.  Presumably they are relying on the fact that many courts view a violation of the
Lanham Act as a per se violation of the CUTPA.  See e.g. Timex Corp. v. Stoller, 961 F. Supp.
374, 381 (D. Conn. 1997), but see also Sporty's Farm, LLC v. Sportsman's Mkt., Inc., No.
3:96CV0756 (AVC), 1998 U.S. Dist. LEXIS 23290, *25 (D. Conn. 1998) (Finding of a violation
of the Lanham Act does not necessarily obviate the necessity to consider the CUTPA standard).
Thus, if Defendants establish their entitlement to summary judgment on Counts One, Two, and
Seven, they presumably establish their entitlement to judgment on Count Eight.  However, because
Defendants fail to establish their entitlement to summary judgment on Plaintiffs' trade dress claims,
separate consideration of Count Eight is unnecessary.

"The concept of trade dress encompasses the design and appearance of the product together with all the elements making up the overall image that serves to identify the product presented to the consumer." Fun-Damental Too v. Gemmy Indus. Corp., 111 F.3d 993, 999 (2d Cir. 1997) (citation omitted). Plaintiffs seek protection of the overall image or design of the product and not its packaging, as trade dress claims once exclusively involved. See Wal-Mart v Samara Bros., 529 U.S. 205, 209, 120 S. Ct. 1339, 146 L. Ed. 182 (2000) (discussing recent expansion of trade dress to encompass design features of the product itself). A plaintiff asserting trade dress rights in a design must prove (1) that its design is "distinctive as to the source of the good," i.e. that it has acquired secondary meaning, and (2) "that there is a likelihood of confusion between its good and the defendant's." Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 115 (2d Cir. 2001). Even assuming demonstration of those elements, trade dress does not protect designs descriptions that are "overbroad or 'generic'" - i.e. "those that 'refer to the genus of which the particular product is a species.'" Id. (citation omitted). Trade dress is not designed to protect ideas or generalized appearances and thus proper interpretation of trade dress protection avoids the "monopolization of products and ideas." Id. Finally, trade dress protection "may not be claimed for product features that are functional." Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 164-65, 115 S. Ct. 1300, 131 L. Ed. 2d 248 (1995). Therefore, the burden is on a plaintiff seeking trade dress protection for a design to demonstrate that it is not functional. TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 29, 121 S. Ct. 1255, 149 L. Ed. 2d 164 (2001). Based on the strong likelihood of functional features appearing in product designs and the desire to avoid creating a monopoly in the goods themselves, as opposed to simply their appearance, courts exercise "particular caution" when "extending protection to product designs."

7

Yurman, 262 F.3d at 114-15.  As Defendants move for summary judgment with respect to each of these elements, they will be defined further and discussed below.

1.    Sufficiency of Plaintiffs' Description of Their Trade Dress:

Defendants argue that Plaintiffs cannot be afforded any protection because they have failed to adequately describe their claimed trade dress.  With respect to a product line, a "focus on the overall look of a product does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress."  Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 381 (2d Cir. 1997).  Requiring an appropriate level of specificity furthers several important interests: 1) "without a specification of the design features that compose the trade dress, different jurors viewing the same line of products may conceive the trade dress in terms of different elements and features, so that the verdict may be based on inconsistent findings"; 2) "no juror can evaluate secondary meaning, overbreadth, or nonfunctionality without knowing precisely what the plaintiff is trying to protect"; 3) "a plaintiff's inability to explain to a court exactly which aspects of its product design(s) merit protection may indicate that its claim is pitched at an improper  level of generality, i.e., the claimant seeks protection for an unprotectable style, theme or idea[,]" which will help eliminate claims that "are overbroad as a matter of law"; and 4) "courts will . . . be unable to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection."  Yurman Design, 262 F.3d at 117 (internal citations omitted).

Plaintiffs argue that although they meet the requirements set out above, because Yurman and Landscape Forms apply to product lines, not individual products, they are not applicable.  Pl. Br. Opp. Def. Mot. for Summ. J. at 8-9 n. 3.  Moreover, Plaintiffs caution against requiring an

8

emphasis on written descriptions of the dress over and above the visual representations submitted. Id. at 7, citing Imagineering, Inc. v. Van Klassens, Inc., 851 F. Supp. 532, 542 (S.D.N.Y. 1994) ("To require that [a plaintiff] describe its trade dress only in prose would run the risk, first, that the description might not adequately describe this 'image,' and, second, that defendants' would be provided numerous opportunities to seek to evade the injunction's proscription by, for example, changing one aspect of a multi-faceted 'image' and claiming that the trade dress, as defined, was not being infringed").

While the present action does not involve an entire line of products, Plaintiffs do not point to any case law that would prevent a court from imposing similar standards here. Indeed, the reasoning behind Landscape Forms and Yurman Designs is persuasive in any trade dress claim. It is more relevant when, as here, the product involved is part of a long and well-known history and where Defendants argue that the design itself is part of the public domain and not Plaintiffs' to claim. Under these circumstances it is appropriate to require Plaintiff to clearly articulate the basis for its trade dress claim rather than risk overbroad protection and imprecise relief (should any be granted). With that said, the usefulness of visual representations of the product to aid the trade dress definition is not in dispute.

As to the actual description, in their Complaint Plaintiffs describe the trade dress in the following way:

(a) the shape, style, composition and finish of the grip frame;
(b) the angle of the grip frame in relation to the frame and barrel;
(c) the shape, style, composition and finish of the trigger and trigger guard;
(d) the angle or slant of the trigger guard in relation to the frame and barrel;
(e) the shape, style, composition and color of the grip panels, including the rampant colt and eagle emblazoned on the sides;
(f) the shape and style of the front sight;

(g) the shape and style of the rear sight;

(h) the shape, style and finish of the checkered hammer;

(i) the shape, style and finish of the color case hardened frame;

(j) the shape, length, style and finish of the steel barrel;

(k) the shape, style and finish of the steel cylinder;

(l) the shape, style and finish of the cylinder pin; and

(m) the shape, style and finish of the ejector rod and ejector rod housing.

Amended Complaint ¶43.  Although not elaborating on this description in the text of their

Opposition Brief, Plaintiffs point to two exhibits to further define the nature of their claims.  Pl.

Br. Opp. Summ. J. at 10.

    In a lengthy response to Defendants' interrogatory requesting that Plaintiffs more

specifically detail the features of the revolver claimed to be unique and/or distinctive, Plaintiffs

describe the shape and appearance of the frame, rear sight, hammer, cylinder, cylinder pin,

trigger, trigger guard, grips, grip frame, front sight, barrel, ejector rod, ejector rod housing, and

some variations in finish and barrel length that are available.  See Fortner Decl., Exh. 75.  The

obvious implication of this description is that Plaintiffs are quite literally claiming the

appearance of the entire gun leaving nothing out.

    Michael Reissig's testimony supports this conclusion, explaining that Plaintiffs claim "the

overall appearance of the gun."  Decl. of Robert Gill, Exh. 1, Reissig Depo. at 173.  According to

Reissig, this entails any available barrel length, the current configuration of the front sight, any

combination of colors that may appear through the color case hardening process, both the half

moon and donut shapes of the ejector rod head (and any variations thereof), the position of the

roll marks on the gun, other words appearing on the barrel, the rampant colt and eagle stamped

on the grips, the overall appearance of the hammer (including the color, which may include

nickel, color-case, plated, blue, and fire blue), and the hammer as it relates to the rest of the

appearance of the gun.[4]  Id. at 172-89.

Defendants contend that these descriptions are insufficient.  In particular, Defendants point to changes in the alleged trade dress over the years and question which changes are part of Plaintiffs' trade dress claims and which are excluded - if any.  Defendants point to changes in the revolver's frame, including the various frame finishes mentioned above, finishes to the barrel, cylinder, trigger guard and backstrap, variations in hammer shapes and hammer gnurling, base pin, cylinder beveling, ejector rod heads, ejector rod housings, firing pins, front sights, rear sights, trigger guard shapes, and cylinder bushings.  Def. Br. Supp. Summ. J. at 7.  Defendants also point to variations in the grips ranging from rubber with rampant colt, but no eagle, to rubber with both rampant colt and eagle.  Id. at 13.  Defendants allege that the grips have been offered in wood with medallions and wood without medallions as well.  Id.[5]

While disputing the extent and significance of these variations, nowhere do Plaintiffs assert that there have been no variations at all.  In fact, Plaintiffs assert that Defendants' revolver matches some of the variations mentioned and that variation in a 130 year old product is to be expected.  Pl. Br. Opp. Summ. J. at 11 and n.6, citing Samara Bros. v. Wal-Mart Stores, 165 F.3d 120, 129 (2d Cir. 1998) ("We do not mean to suggest, however, that in order to gain protection each garment must contain identical specified design elements. We expect that in a product line there will be inevitable variation in the products"), rev'd in part 529 U.S. 205, 146 L. Ed. 2d 182, 120 S. Ct. 1339 (2000).  Plaintiffs clarify that with respect to color case hardening, what is

---

[4]    The witness does not appear to claim the actual firing pin, but rather as stated how the shape of the hammer looks in relation to the rest of the gun.  Reissig Depo. at 187:17-20.

[5]    Plaintiffs object to some of Defendants' evidence in support of this contention as hearsay.  Pl. Br. Opp. Summ. J. at 11 n. 7.  Plaintiffs' objection is conclusory and does not properly raise the question.  It will not be considered.

distinctive is the fact that the frame, as opposed to the entire gun, is finished in that fashion.  Id. at 12.  And Plaintiffs assert that despite all this, the overall look of the revolver has remained essentially unchanged and recognizable.  They assert that it would be improper to focus too narrowly on individual features, as they "need not be separately protectible" in light of the overall appearance.  Id., citing Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1042 (2d Cir. 1992) ("Individual aspects of a trade dress may be eligible for trademark protection in their own right, but in an action for trade dress infringement each aspect should be viewed in relation to the entire trade dress").  While this may be true, at some point deflecting focus from individual features in favor of the whole becomes a sort of claim construction sleight of hand that prevents meaningful interrogation of the nature of the claim asserted.

On the facts presented, any lack of clarity in Plaintiffs' descriptions stems from their attempts to claim the entire appearance of the revolver and the difficulty inherent in adequately describing all the requisite details.  Should all other elements be met, there is no rule of law known or cited that prohibits a plaintiff from claiming the entire appearance of a product as its trade dress.  In this sense, Plaintiffs adequately describe the claimed trade dress.[6]

    2.    Proof of Secondary Meaning:

In order to be protected, trade dress must be distinctive.  See Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 209, 120 S. Ct. 1339, 146 L. Ed. 2d 182 (2000) (Without the protected trade dress being distinctive, potentially infringing trade dress would not cause confusion as to the origin, sponsorship or approval of the goods).  Trade dress can be distinctive

---

[6]    It should be noted however that Plaintiffs are bound to what they claim and it is therefore possible that relatively minor variations in the replicas may affect the overall appearance and defeat Plaintiffs claims.

in two ways: 1) it is inherently distinctive if its "intrinsic nature serves to identify a particular source of a product"; or 2) if the dress has acquired distinctiveness that "in the minds of the public, the primary significance" of the trade dress "is to identify the source of the product rather than the product itself." Id. at 210-11. In either case, it is the ability of the trade dress to designate a product source that is decisive. However, as to product designs, trade dress cannot be inherently distinctive and a plaintiff must show secondary meaning for the dress to be protected under the Lanham Act. Id. at 215. Accordingly, Plaintiffs here must be able "to show that, over time, the trade dress has become identified with its producer in the minds of potential consumers." L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co., 79 F.3d 258, 263 (2d Cir. 1996). Proof of secondary meaning "entails vigorous evidentiary requirements" and generally involves demonstration of six factors: 1) advertising expenditures; 2) consumer studies linking product appearance to product source; 3) sales success; 4) unsolicited media coverage of the product; 5) attempts to plagiarize the trade dress; and 6) length and exclusivity of use. Thompson Medical Co. v. Pfizer, Inc., 753 F.2d 208, 217 (2d Cir. 1985). However, no single factor is determinative and every element need not be proven. Id. Because a producer may use a competitor's trade dress if it is without secondary meaning, the proper time period for determining secondary meaning is when the alleged infringement began, not the date of the original product's introduction. Nora Beverages, Inc. v. Perrier Group of Am. Inc., 164 F.3d 736, 745 (2d Cir. 1998). In this case, that date is the year 2000 when Defendants began selling their replicas.

a.     Advertising Expenditures:

Plaintiffs argue that the "record contains an abundance of evidence" relating to their

advertisements.  Pl. Br. Opp. Def. Mot. for Summ. J. at 69.  The record does not support this

assertion.  Plaintiffs cite only seven exhibits containing catalogs or advertisements that focus on

the revolver's trade dress.  Id.  Plaintiffs do not produce any evidence of expenditures or other

relevant evidence pertaining to advertising.  Furthermore, they concede that since 1999 they have

not advertised any single action revolver in gun periodicals.  Id. at 70.  Considering that Plaintiffs

have been manufacturing the revolver for about 50 years since resuming production, the evidence

produced could properly be denied weight by a fact finder.  Nevertheless, Plaintiffs produce

some evidence of advertising and therefore the question cannot be resolved on summary

judgment and must be counted against Defendants.

b.     Consumer Studies:

Plaintiffs point to the survey conducted by Warren Keegan as evidence of consumers

linking Plaintiffs' alleged trade dress with Plaintiffs.  The survey Keegan conducted, although

"designed to determine consumer confusion of the names, trade symbols, and overall appearance

of the two single action revolvers ... also [allegedly] had the effect of testing consumer awareness

of the marks and trade dress."  Decl. of H. David Starr, Exh. 26 at 3.  To this effect Keegan states

that "[w]hen shown the AWA Peacekeeper 67% indicated that they knew who made the gun.  Of

those, only 26% named AWA while 58% incorrectly named Colt's."  Id. at 8.  This finding does

not demonstrate a link between the claimed trade dress with Plaintiffs.  In order to demonstrate

such a link, consumers surveyed would have to be shown Plaintiffs' gun and identify Plaintiffs as

the manufacturer.  Keegan's report goes onto state that of those who "claimed to know who made

the Peacemaker" 91% correctly named Colt, Id., but it is somewhat unclear from the write up

whether this refers to people being shown the Peacemaker (thus looking at its trade dress) or the

14

point in the survey when participants are asked (without viewing the revolver itself) whether they have heard of a gun called the Peacekeeper and if they know who manufactures that gun. Based on an examination of the survey results, this statement apparently refers to the former and would be some evidence of secondary meaning. To the extent that it is the latter, that question would have no value towards demonstrating secondary meaning with respect to Plaintiffs' trade dress.

Defendants argue that this survey cannot be considered evidence of secondary meaning because it was designed to test consumer confusion. Def. Br. Supp. Summ. J. at 68. Defendants point to no law that would require this conclusion and it is not desirable to formulate a rule of law that would prevent consideration of unintended, but relevant, consequences of a survey so long as those results indicate trustworthiness. Defendants also argue that because source indicators were left on the pictures of the revolvers, the survey results are not probative as to secondary meaning. Def. Br. Supp. Summ. J. at 69. Plaintiffs counter that this is irrelevant because participants were not exposed to the manufacturers' names until towards the end of the survey when they viewed the photographs and even when exposed to the names participants still misidentified Defendants' revolver as being made by Plaintiffs. Pl. Br. Opp. Summ. J. at 70-71. Plaintiffs misstate the nature of secondary meaning. It is inconsequential that the participants misidentified Defendants' revolver as Plaintiffs'. Plaintiffs must affirmatively show that participants identified their revolver's trade dress with Plaintiffs' manufacture. To assume misidentification of Defendants' revolver demonstrates secondary meaning in Plaintiffs' trade dress presupposes an answer to the very question this litigation is intended to answer. Furthermore, if Plaintiffs' name appeared on the revolver the trade dress of which is at issue, then this fact casts substantial doubt on any attempt to link participants' identification of Plaintiffs as

15

the manufacturer to the distinctive nature of the trade dress and not simply the fact that Plaintiffs'

name appeared on the revolver.  Accordingly, as a matter of law this factor does not weigh in

Plaintiffs' favor.  Although, a court cannot weigh the credibility of the evidence at summary

judgment, the nonmoving party must still produce enough evidence such that a reasonable trier of

fact could find in their favor.  See Bryant, 923 F.2d at 982 (Summary judgment is appropriate

when reasonable minds could not differ as to the import of the evidence).  Plaintiffs have failed

to meet that burden with respect to this factor.

### c.      Unsolicited Media Coverage of the Product:

Both parties acknowledge that much has been written about Plaintiffs' revolvers.

Defendants, however, argue that much of what was written focuses on the time period before

1940 when Plaintiffs initially halted production of the revolver and is not relevant to demonstrate

secondary meaning today.  Def. Br. Supp. Summ. J. at 70-71.  As stated above, the relevant

period for determining secondary meaning is when Defendants entered the market in 2000.  It is

unlikely therefore that media coverage from over 60 years ago or pertaining to that period is

relevant to that determination.  However, Plaintiffs also produce evidence of more recent media

attention.  Defendants argue that because media attention has been focused on replicas as well,

media attention dedicated to Plaintiffs does not demonstrate secondary meaning.  Id. at 71.

Determining the weight to accord this evidence is properly a question for a trier of fact and not a

court on summary judgment.

### d.      Sales Success:

Plaintiffs contend that since the introduction of its revolver, the total sales reach

approximately one million.  Pl. Br. Opp. Summ. J. at 72.  Defendants contend that in recent years

16

replica revolvers have sold at least as many revolvers as Plaintiffs, suggesting a lack of secondary meaning in Plaintiffs' trade dress.  Def. Br. Supp. Summ. J. at 71.  Recent sales success is more probative towards demonstrating secondary meaning as it pertains to this action, but a question nevertheless remains as to the proper weight given to each party's evidence.  Attempting to resolve that question would be inappropriate on summary judgment.

e.       Attempts to Plagiarize the Product:

Intentional copying may constitute "persuasive evidence of consumer recognition." Coach Leatherware Co. v. AnnTaylor, Inc., 933 F.2d 162, 169 (2d Cir. 1991).  This is particularly so when "the circumstances indicate an intent to benefit from the good will of the prior user through confusion."  Laureyssens v. Idea Group, Inc., 964 F.2d 131, 136 (2d Cir. 1992).  However, this fact alone does not establish secondary meaning, Coach Leatherware, 933 F.2d at 169, and should be balanced against the recognition that, absent other legal protections, imitation in the marketplace is a good thing.  See American Safety Table Co. v. Schreiber, 269 F.2d 255, 272 (2d Cir. 1959) ("It is the unimpeded availability of substantially equivalent units that permits the normal operation of supply and demand to yield the fair price society must pay for a given commodity") (citation omitted).

It is undisputed that Defendants were manufacturing replicas of Plaintiffs' revolver. Furthermore, Defendants' advertising has at least referenced Plaintiffs' history and founder Sam Colt.  Pl. Br. Opp. Summ. J. at 72.  While, these facts alone are not necessarily determinative - Defendants point out, there have been manufacturers of similar replicas for years and they continue to this day - Defendants have not presented undisputed evidence that would entitle them to summary judgment.  At best, Defendants create a question out of this factor which would have

17

otherwise looked very much like Defendants were purposely trading on Plaintiffs' good will. Accordingly, summary disposition is unavailable on this factor.

f.    Length and Exclusivity of Use:

Plaintiffs have been manufacturing their revolvers since 1873.  Defendants, however, note that since 1956 Plaintiffs have been competing with other replica makers and that when Defendants began marketing their gun, nine replica sellers were in the market.  Def. Br. Supp. Summ. J. at 72.  Plaintiffs argue that the significance of "third-party copying depends wholly upon their usage, and third-party marks must be 'well promoted' or 'recognized' by consumers in order to be of significance."  Pl. Br. Opp. Summ. J. at 73, citing Scarves by Vera, Inc. v. Todo Imports, Ltd., 544 F.2d 1167, 1170 (2d Cir. 1976) ("Defendant introduced no evidence that these [third-party] trademarks were actually used by third parties, that they were well promoted or that they were recognized by consumers").  Plaintiffs' arguments are in error.  Scarves by Vera dealt with registered trademarks which are presumptively distinctive, Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 871 (2d Cir. 1986), but Plaintiffs receive no such presumption concerning their trade dress.  In fact, the very purpose of this discussion is a determination of whether Plaintiffs' claimed trade dress is distinctive.  Thus, requiring Defendants to demonstrate that competing users are recognized by customers misplaces the burden of proof and places the proverbial cart before the horse.  Accordingly, based on the undisputed facts, length of use weighs in Plaintiffs' favor, but exclusivity certainly does not.[7]  This in effect creates a factual question over how to weigh this factor and must count against summary judgment in favor of

---

[7]    Of course, the significance of this fact may be mitigated by weighing the import of evidence of intentional copying.  No position is taken on the outcome of this balancing of factors here.

18

Defendants.

g.     Conclusion as to Secondary Meaning:

On balance Plaintiffs do not present particularly strong evidence of secondary meaning in their trade dress.  However, because there are factual disputes with respect to some of the factors discussed, and a finding of secondary meaning can only be made by a careful consideration of all six factors, with no single factor being determinative, the question cannot be decided as a matter of law, but is properly to be decided by a jury.  Accordingly, Defendants' Motion is **denied** on this ground.

3.     Whether Plaintiffs' Trade Dress has been Abandoned or is Generic:

Defendants argue that Plaintiffs have either abandoned their trade dress or that it has become generic and is no longer protectable.  To support a finding of abandonment, use of the mark or trade dress must have been "discontinued with intent not to resume such use" or, as a result of the conduct of the owner, "become the generic name for the goods or services on or in connection with which it is used" and have lost "its significance as a mark."  L. & J.G. Stickley, Inc., 79 F.3d at 263.  Thus, the claims that a mark is generic or abandoned are related.

Even assuming a product design is distinctive, that "is insufficient to protect product designs that are overbroad or generic - those that refer to the genus of which the particular product is a species."  Yurman Design, 262 F.3d at 115 (citation and quotations omitted).  Trade dress may be generic if it "conforms to a well-established industry custom."  Nora Beverages, 164 F.3d at 743.  Defendants argue that Plaintiffs abandoned their trade dress and that when they resumed manufacturing western style single action revolvers in 1955, there "was already at least one other company manufacturing replicas" of Plaintiffs' Model "P."  Def. Br. Supp. Summ. J. at

19

61. Since that time, others have entered the market to produce similar replicas, which are produced to this day.  Defendants allege that Plaintiffs knew of these replicas and did nothing to stop their production.  Thus, because Plaintiffs' "trade dress has been used for so many years by these numerous entities and because [Plaintiffs'] own actions promoted and acknowledged that it had no exclusive rights to the appearance of the Colt Model 'P'," the appearance has become generic.  Id. at 64-65.

Common usage may render trade dress that was once distinctive generic if, by virtue of the use, the dress "can no longer be understood to represent  a source" of the product.  BellSouth Corp. v. DataNational Corp., 60 F.3d 1565, 1570 (Fed. Cir. 1995).  This inquiry may involve a highly factual analysis to demonstrate that consumers do not in fact identify the trade dress with its source, or any source.  See Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 110 (2d Cir. 2000) (Discussing with approval district court's requirement that a "highly factual analysis of consumer perception and identification" be undertaken in order to prove that the trade dress is generic).  The question is linked to whether Plaintiffs can prove secondary meaning, or that their trade dress is identified with a source.  Defendants are not precluded from proving the product generic through common usage but, in order to so prove, it entail proving that Plaintiffs trade dress lacks secondary meaning.  As discussed above, there is a question of fact as to whether consumers identify Plaintiffs' trade dress with a source.   As a consequence, simply pointing to the existence of other replica makers is not sufficient to establish that there is no question that the trade dress is generic.  Summary judgment on Defendants generic argument is therefore inappropriate.

Defendants' assertion of a defense of abandonment also centers on the interruption in

20

Plaintiffs production of the Peacemaker revolver from 1941 to 1955 and the near constant

presence of replica makers since Plaintiffs returned to the market in 1956.  Def. Br. Opp. Summ.

J. at 60.  Plaintiffs argue that they did not intend to permanently cease production of the revolver

and that they maintained consumer goodwill during the period of non-production such that when

they resumed production in 1956 it retained its secondary meaning among consumers.  Pl. Br.

Supp. Summ. J. at 57-60.

Defendants rely heavily on the Second Circuit's opinion in L. & J.G. Stickley, Inc. v.

Canal Dover Furniture Co., 79 F.3d 258 (2d Cir. 1996) to support their claim for abandonment.

See Def. Br. Opp. Summ. J. at 61-63.  Stickley involves a furniture maker, Gustav Stickley who

was largely part responsible for a popular style of furniture.  L. & J.G. Stickley, Inc., 79 F.3d at

260.   When the designs became commercially unpopular, Stickley ceased producing them and

joined his brothers in a cabinet making business.  Id.  That company became L. & J.G. Stickley,

which 60 years later decided to capitalize on the renewed popularity of the designs and began to

manufacture them once more.  Id. at 260-61.  Given these facts, the Second Circuit noted the

difficulty the manufacturer would face "in establishing that consumers identify the [presently

manufactured] trade dress with L. & J.G. Stickley rather than with the maker of the popular

originals."  Id. at 264.  Because of that difficulty, the Second Circuit found L. & J.G. Stickley

unlikely to succeed on the merits and vacated a preliminary injunction against the defendant.  Id.

at 264-65.[8]

In this respect, the Second Circuit distinguished its decision from Ferrari S.P.A. Esercizio

---

[8]       This procedural detail is important in that the Second Circuit did not prevent Stickley from going
        forward, as Defendants ask this Court to do, rather they merely found that the claim was unlikely to
        succeed and did not warrant a preliminary injunction.

v. Roberts, 944 F.2d 1235 (6th Cir. 1991) because the Sixth Circuit "found that even though Ferrari had ceased production of its 365 GTB/4 Daytona in 1974, the car design maintained secondary meaning in the eyes of the public because Ferrari continued to design cars with a very similar appearance and continued to manufacture parts for 365 GTB/4 Daytona owners." L. & J.G. Stickley, Inc., 79 F.3d 258 at 264 n. 5.  Loss of secondary meaning during the period of non-production is therefore essential to a finding of abandonment.  However, as discussed above, there remains a dispute of fact over the existence of secondary meaning.  Accordingly, Defendants claim of abandonment cannot be resolved on summary judgment.

It bears mentioning however, that even "[o]nce a registered trademark has been abandoned, any subsequent user of the mark must measure its rights from the time the subsequent use begins, and cannot rely upon any residual secondary meaning in the mark from the original period of use." Id. at 263-64.  This is the case *even if the original user resumes use* of the abandoned trade dress.  Id. at 264 (emphasis added).  Thus, even if a fact-finder were to find that, based on the interruption in production, Plaintiffs' trade dress lost its secondary meaning, this would not preclude Plaintiffs from rebuilding secondary meaning in the almost 60 years it has been manufacturing the revolvers before Defendants entered the market.  All that Plaintiffs would be prohibited from doing is relying on secondary meaning acquired prior to abandoning its trade dress.  In this sense, the abandonment argument, even if successful, is not likely to get Defendants far because secondary meaning must be established at the time Defendants entered the market, Nora Beverages, 164 F.3d at 745, and thus focusing on any loss of secondary meaning 60 years ago may not be determinative.  Similarly for Plaintiffs, focusing on the storied history of their revolver may not help them in establishing secondary meaning if

22

they cannot demonstrate that such goodwill persists to this day.

4.    Functionality:[9]

As discussed above, trade dress protection cannot be had for features that are functional and the burden is on the party seeking protection to prove nonfunctionality. TrafFix, 532 U.S. at 32. Functionality is a question of fact, Innovative Networks v. Satellite Airlines Ticketing Ctrs., 871 F. Supp. 709, 723 (S.D.N.Y. 1995), thus any factual disputes will preclude summary judgment. There are two types of functionality at issue: traditional or utilitarian functionality and aesthetic functionality.

a.    Traditional/Utilitarian Functionality:

The Supreme Court recently reasserted the prominence of the so-called "traditional rule" of functionality. Id. at 33. Under this rule and "'in general terms, a product feature is functional,' and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 165, 115 S. Ct. 1300, 131 L. Ed. 2d 248 (1995), citing Inwood Labs. v. Ives Labs., 456 U.S. 844, 851 n. 10, 102 S. Ct. 2182, 72 L. Ed. 2d 606 (1982). In TrafFix, the Supreme Court discussed the effect of prior patents, noting that a "utility patent is strong evidence that the features therein are functional." 532 U.S. at 29. However, even in the context of a patent, a manufacturer might be successful in seeking "to protect arbitrary, incidental, or ornamental

---

[9]    It is important to keep in mind that with respect to most of the discussion of functionality that it is geared towards whether or not Defendants have properly supported their Motion and if so whether Plaintiffs produce enough evidence to survive summary judgment on that point. The Ruling is thus narrowly tailored to the adequacy of Plaintiffs' response to Defendants' arguments. This should not detract from or bear on Plaintiffs' ultimate burden to affirmatively prove nonfunctionality at trial, which is distinct from their burden at summary judgment.

aspects of features of a product found in the patent claims, such as arbitrary curves in the legs or an ornamental pattern painted on the springs" if "those aspects do not serve a purpose within the terms of the utility patent." Id. at 34.  The "Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity." Id.[10]

The TrafFix decision is also important with respect to the relevance of design alternatives to a functionality inquiry.  In the past, the Second Circuit (and others) considered the availability of design alternatives in determining the functionality of a feature.  See e.g. Fabrication Enterprises. v. Hygenic Corp., 64 F.3d 53, 59 (2d Cir. 1995) ("a court must examine a number of variables, including (1) the degree of functionality of the similar features of the product, (2) the degree of similarity between the non-functional (ornamental) features of the competing products,

_____

[10]     The left side of the Model P revolver includes three patent dates corresponding to U.S. Patent No. 119, 048 (issued 9/19/1871), U.S. Patent No. 128, 644 (issued 7/2/1872), and U.S. Patent No. 158, 957 (issued 1/19/1875).  Def. Br. Supp. Summ. J. at 44.  Defendants argue that because features of the alleged trade dress are pictured in the drawings pertaining to the 1873 and 1875 patents, those features have been dedicated to the public and are not protectable.  Id. at 44-47.

It is generally true that "the claim of a specific device or combination, and an omission to claim other devices or combinations apparent on the face of the patent, are, in law, a dedication to the public of that which is not claimed."  Miller v. Brass Co., 104 U.S. 350, 352 (1881); see also General Radio Co. v. Kepco, Inc., 435 F.2d 135, 136-37 (2d Cir. 1970) ("The fact that the [device] was not specifically claimed ... is not determinative, for the device was disclosed in the specification and is thus public property").  This rule is distinct from the principle discussed above in TrafFix 532 U.S. at 29 (stating that the existence of a utility patent is strong evidence of functionality), largely ignored by Defendants, and it is not clear that it applies to trademark protection.  See J. Thomas McCarthy, 1 McCarthy on Trademarks and Unfair Competition § 7:89.2, 7-259 (4th Ed. 2003) (Stating author's view that "this rule is confined to patent law").  Indeed, such a rule would exclude trade dress protection for any shape or design visible in a patent specification regardless of the functionality of that feature and would seem to cut against, if not render obsolete, the Supreme Court's statement about the significance of utility patents for determining functionality.  A utility patent would not be strong evidence of functionality, but conclusive evidence of the unavailability of trade dress protection.  Accordingly, it is most in line with trademark law to apply a functionality analysis, which addresses the concerns surrounding the perpetual nature of trade dress protection applied to a utilitarian design, rather than fashion a potentially overbroad rule and exclude designs otherwise protectable under the principles of trade dress law.

and (3) the feasibility of alternative designs that would not impair the utility of the product");

Stormy Clime, Ltd. v. Progroup, Inc., 809 F.2d 971, 977 (2d Cir. 1987) (directing consideration

of the same factors); see also Landscape Forms, 70 F.3d at 254-55 (remanding for the district

court to consider whether the design confers a significant competitive benefit that cannot

practically be duplicated by the use of alternative designs).  In TrafFix, however, the Court wrote

that the functionality of the design at issue under the traditional Inwood analysis meant

"competitors *need not explore whether other spring juxtapositions might be used*. The

dual-spring design is not an arbitrary flourish in the configuration of [the plaintiff's] product; it is

the reason the device works."  532 U.S. at 33-34 (emphasis added).

　　　Nevertheless, Plaintiffs argue that this language does not preclude consideration of design

alternatives.  Pl. Br. Opp. Def. Mot. for Summ. J. at 20.  In support, Plaintiffs cite to a post-

TrafFix Second Circuit opinion that requires looking to the feasibility of design alternatives.  Id.,

citing Neiman Marcus Group, Inc. v. A'Lor Int'l, Ltd., No. 00-9504, 2001 U.S. App. LEXIS

25182, *4 (2d Cir. Nov. 20, 2001).  Neiman Marcus makes no mention of TrafFix, but it does

post-date it by several months.  However, the opinion in Neiman Marcus is unpublished and

clearly marked "summary order."  According to the Second Circuit's Local Rules of Appellate

Procedure, because summary orders "do not constitute formal opinions of the court and are

unreported or not uniformly available to all parties, they shall not be cited or otherwise used in

unrelated cases before this or any other court."  Local Rule § 0.23.  Plaintiffs' reliance on Neiman

Marcus is therefore misplaced and is not binding authority.  This is not to say that there is no

authority for the proposition that design alternatives may still be considered, see Pl. Br. Opp. Def.

Mot. for Summ. J. at 21-22 (citing to various unpublished district court cases in this circuit), but

Plaintiffs have not pointed to any binding authority.

Other circuits are divided as to the question of design alternatives. The Federal Circuit has found that even though "there is no need to consider the availability of alternative designs ... that does not mean that the availability of alternative designs cannot be a legitimate source of evidence to determine whether a feature is functional in the first place." Valu Engineering, Inc. v. Rexnord Corp., 278 F.3d 1268, 1276 (Fed. Cir. 2002). The Federal Circuit concluded, therefore, that TrafFix did not change applicable law, Valu Engineering, 278 F.3d at 1276, and thus because prior case law directed consideration of design alternatives, it is still necessary to do so. The Sixth Circuit found differently, opting not to consider design alternatives, because "at the very least, a court is not *required* to examine alternative designs when applying the traditional test for functionality" and that if "if a product is clearly functional under Inwood, a court need not apply the competitive-necessity test and its related inquiry concerning the availability of alternative designs." Antioch Co. v. W. Trimming Corp., 347 F.3d 150, 156 (6th Cir. 2003) (emphasis in original). The latter position is more in line with TrafFix. There is nothing to suggest that courts are prohibited from considering design alternatives, but when functionality is apparent under the Inwood test, the inquiry is over and the existence of design alternatives cannot resurrect an otherwise functional feature. Accordingly, to the extent that Second Circuit law required consideration of design alternatives in all circumstances, that is no longer the law.

However, under the present circumstances and given the nature of the product, the existence of design alternatives is helpful for determining whether a particular design is truly necessary to the way the revolver works. For example, Plaintiffs assert that with respect to the grip frame on the revolvers that they are not claiming the handle itself (in layman's terms), but

26

rather a specific shape of a handle that is separable from the handle itself.  In order to determine whether the specific shape is in fact separable, it is instructive to look to whether other shapes exist and whether they are similarly effective.  The critical inquiry then is the "feasibility of alternative arrangements of functional features that *would not impair the utility* of the product." Fabrication Enterprises, 64 F.3d at 59 (emphasis added).  The mere existence of other designs does not satisfy that requirement as those designs may be functionally deficient by comparison. Accordingly, for design alternatives to be probative, Plaintiffs must produce evidence that could demonstrate that the alternative design would be equally effective as a functional matter.

Because Plaintiffs are seeking trade dress protection for the overall appearance of the revolver, breaking down the trade dress into its individual elements and then attacking them as functional may be error.  Le Sportsac, Inc. v. K Mart Corp., 754 F.2d 71, 76 (2d Cir. 1985); see also Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 842 (9th Cir. 1987) ("We examine trade dress as a whole to determine its functionality ... elements that are separately unprotectable can be protected together as part of a trade dress").  "Nonetheless, the fact that a trade dress is composed exclusively of commonly used or functional elements might suggest that that dress should be regarded as unprotectable or 'generic,' to avoid tying up a product or marketing idea." Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27, 32 (2d Cir. 1995).  As a result, Plaintiffs' claimed trade dress will be considered first as to its individual parts and then as a whole.

> i.    The shape, style, composition, and finish of the grip frame:

Defendants argue that the shape and style of the grip frame "serve to allow the shooter to best hold the revolver and to handle the recoil of the gun when fired."  Def. Br. Supp. Summ. J.

27

at 32.  They also argue that the composition of the frame, steel, works more effectively than other metals and that the finishes that are available (blued or nickeled) prevent oxidation.  Id. at 33. Plaintiffs' characterization of Defendants' arguments as simply allowing "the shooter to grip the gun," Pl. Br. Opp. Summ. J. at 24, (like any grip frame would) misses Defendants' assertion that the specific shape allows for certain advantages.  Defendants point to many other possible designs for the grip frame, but simply pointing to these other designs fails to elucidate how these designs offer similar or better functional advantages such that a buyer would not suffer in functional efficiency when purchasing a gun with these designs alternatives.  As stated above, the fundamental inquiry when looking to design alternatives is that the other arrangements do not impair the utility of the product.  Stormy Clime, 809 F.2d at 977.

Plaintiffs also argue that "the contours of the frame do not serve any specific purpose." Id.  This argument is conclusory and nowhere elaborated, not even in the exhibit cited.  See Gill Decl., Exh. 19, ¶ 19.

Plaintiffs point to statements by Defendants' personnel to the effect that because they were making replicas of Plaintiffs guns they chose not to use other possible designs.  Pl. Br. Opp. Def. Mot. for Summ. J. at 25.  This does raise a question concerning other possible motivations for using a grip frame similar to Plaintiffs', but does not address directly the issue of functional advantages.  Nowhere is it established that the desire to copy negates or is mutually exclusive to the issue of functionality.  That is, there is no reason why Defendants' desire to copy a feature, as opposed to using similar features on other revolvers, negates functionality.

As to the finishes and metals used on the grip frame, Plaintiffs, while conceding a certain functionality, again simply point to alternatives without establishing that these other finishes and

28

metals would work just as well.  Id. at 25.

Accordingly, Plaintiffs fail to meet their burden to produce evidence sufficient to raise a question of nonfunctionality with respect to the grip frame.

> ii.    The angle of the grip frame in relation to the frame and barrel:

Plaintiffs define the angle of the grip frame in relation to the frame and barrel as approximately 7 ½ degrees.  Pl. Br. Opp. Summ. J. at 25.  Plaintiffs assert that this angle is cosmetic[11] and serves to "make the gun look the way it does" but does not serve any function.  Id. at 26.  Plaintiffs point to no design alternatives that would work just as well.  Defendants argue that this angle is functional in that "it positions your hand so that the barrel will shoot."  Def. Br. Supp. Summ. J. at 33.  If the angle were different, the user would have to point the barrel differently to make it shoot accurately.  Fortner Decl., Exh. 32 at 90.  It is not clear whether this angle is necessary to its functioning or merely incidental - i.e. would having to point the barrel differently impede the revolver's use?  On the other hand, it is not clear that Plaintiffs have established nonfunctionality.  There is certainly nothing about the angle that prevents it from both giving the gun a distinct look and serving the purpose of correctly lining up the barrel when it is held.  The weighing and crediting of these two accounts is therefore in the province of the fact finder and not a court's on summary judgment.  Accordingly, this feature must be considered nonfunctional in considering Defendants' Motion.

> iii.    The shape, style, composition, and finish of the trigger and trigger guard:

---

[11]    Defendants argue that Plaintiffs' witness has conceded functionality.  Def. Br. Supp. Summ. J. at 33, citing Def. Exh. 14 at 98-101.  Plaintiffs witness does make this concession but consistently asserts the purely cosmetic nature of this feature.

The trigger and trigger guard serve the obvious function of firing the gun and protecting against premature firing. Nonetheless, Plaintiffs argue that neither the specific shape (not size) of the trigger guard nor the finish of both the trigger and the trigger guard are dictated by this function. Pl. Br. Opp. Summ. J. at 26. Plaintiffs argue that although the shape of the trigger has to be different from that of a double action revolver and that the trigger design on their revolver is designed for a single action revolver, that this does not mean that the trigger design is functional. Pl. Br. Opp. Summ. J. at 26-7. How this is so is entirely unclear and counterintuitive. Indeed, it seems to be a statement that the trigger design is functional as it is dictated by the mechanical necessities of the gun. Furthermore with respect to the blued finish, Plaintiffs continue to fail to address the alleged functional benefits discussed above with respect to the grip frame and simply point to the existence of alternatives as if this fact by itself raises a question of functionality. Pl. Br. Opp. Summ. J. at 27. Thus, Plaintiffs fail to meet their burden to produce evidence sufficient to raise a question of fact as to the functionality of the trigger design.

        iv.      The angle or slant of the trigger guard in relation to the frame and barrel:

Defendants argue that the rounded and slanted shape of the trigger guard aid in holstering the revolver. Def. Br. Supp. Summ. J. at 33-34. Plaintiffs argue that while this may be true, any rounded shape will do and the specific shape of their trigger frame is not therefore necessary and functional. Pl. Br. Opp. Summ. J. at 26-27. There is therefore a dispute of fact with respect to this feature which cannot be resolved on summary judgment.

        v.      The shape, style, composition, and color of the grip panels, including the Rampant Colt and eagle emblem emblazoned

30

on the sides:

Defendants allege that users often change the grips on their revolvers for functional (e.g. a better fit) and cosmetic reasons. Def. Br. Supp. Summ. J. at 34. Defendants also argue that the eagle on the sides of Plaintiffs' grips serve the function of providing a "tactile acknowledgment" that the user has the proper grip on the gun. Id. Plaintiffs counter that any logo would serve the same purpose and there is no need for the logo to involve an eagle as Plaintiffs' do. Pl. Br. Opp. Summ. J. at 28. Plaintiffs do not respond to Defendants' argument about the generally functional nature of the grips, but Defendants' argument is conclusory and fails to elaborate how if users change the grips for both functional and cosmetic purposes this demonstrates that the functional aspect of the grips is essential to the use or purpose of the item. Indeed, by their own argument cosmetic reasons may be just as important. Accordingly, although the ultimate burden of persuasion remains with Plaintiff, the burden of production for the purposes of summary judgment on this point has not been properly shifted to Plaintiff.

vi.    The shape and style of the front sight:

A front sight serves the obvious purpose of allowing the user to properly aim the revolver. Defendants further contend that the specific shape of Plaintiffs' sight, namely that it is rounded, eases holstering by preventing snags. Def. Br. Supp. Summ. J. at 35. Plaintiffs argue that there are other designs, including different rounded designs, that would serve the same purpose without affecting quality or effectiveness. Pl. Br. Opp. Summ. J. at 28. Accordingly, there are material factual disputes as to the functionality of the front sight.

vii.    The shape and style of the rear sight:

Again, the rear sight serves an obvious functional purpose. Although, Plaintiffs once

31

again argue that the specific shape is not functional, they cite to no witness testimony or other evidence to that effect. Pl. Mem. Opp. Summ. J. at 29. Indeed, Plaintiffs' own witness, Edwin Zalewa, who testified at deposition that the shape of the front site was not functional as the shape could vary, Fortner Decl., Exh. 11, Zalewa Depo at 115, testified that as to the rear sight, the shape is functional. Id. at 113. Plaintiffs cite to a purported admission by Defendants' witness, Robert Gangi, that were it not for the fact that Defendants were manufacturing replicas of Plaintiffs' first generation single action revolver, there would be other design options for rear sights available. Pl. Br. Opp. Summ. J. at 29, citing Gangi Depo., Starr Decl., Exh. 37 at 216-17. The testimony cited does not address the issue of functional benefits, which the mere existence of other designs does not disprove or negate. Plaintiffs presumably view the testimony as an admission that the design of Defendants' revolver was not based on functional considerations. It is not clear that the testimony amounts to such an admission, nor is it clear that the desire to copy a design for its aesthetic appeal or its functionality are mutually exclusive. While this argument may not be enough to carry Plaintiffs' burden to prove nonfunctionality at trial, it is enough to carry their burden on summary judgment and raise a dispute of material fact. The functionality of the rear sight cannot therefore be resolved on summary judgment.

> viii.    The shape, style, and finish of the checkered hammer:

The hammer is functional in that it allows the revolver to fire. Defendants further contend that the specific shape of the hammer on Plaintiffs' revolver is functional in that it allows for ease of cocking the revolver and that the knurling or checkering on the hammer aid in the user's ability to grip the hammer without slipping. Def. Br. Supp. Summ. J. at 36. Plaintiffs once again point to the existence of alternative designs, but in conclusory fashion without explaining

how these alternative designs would not impair the utility of the product.  Pl. Br. Opp. Summ. J. at 29-30.  Plaintiffs also argue that Defendants have acknowledged that they could have used alternative designs.  Id. at 30, citing Gill Decl., Exh. 13, Taffin Depo. at 107, 128.  The actual transcript is not so blunt and does not necessarily amount to an admission.  Accordingly, with respect to the hammer shape, Plaintiffs do not meet their burden to provide evidence that would support a finding of nonfunctionality.

      ix.      The shape, style, and finish of the color case hardened frame:

Defendants contend that the case frame is functional because it holds the gun together and that the rounded shape of it aids in holstering the revolver.  Def. Br. Supp. Summ. J. at 36. While it is of course true that the frame does hold the gun together, Plaintiffs claim is addressed to the specific shape which they allege is not necessary to ensure that the gun is held together. Defendants do not suggest that this particular shape is the only shape that will hold together a revolver.  Defendants' argument concerning the ease of holstering the evidence is not conclusive. As Plaintiffs point out, the testimony on the subject was not unequivocal.  Pl. Br. Opp. Summ. J. at 30.  Finally, Plaintiffs contend that the use of color-case hardening is not what is claimed, but the fact that only the frame is color-case hardened in contrast to the rest of the revolver.  Id. Defendants do not contend that this selective use of color-case hardening is functional. Accordingly, the functionality of this feature cannot be decided in favor of Defendants on summary judgment.

      x.      The shape, length, style, and finish of the steel barrel:

The barrel serves the function of providing the path through which the bullet travels when

33

the revolver is fired.  All guns must have some sort of barrel.  However, this does not end the inquiry and the specific appearance/design of the barrel must be considered.  Barrel length is clearly a functional consideration.  As Defendants argue, the length of the barrel affects the power and accuracy of a revolver.  Def. Br. Supp. Summ. J. at 37-38.  Defendants' reference to historical accuracy does not, as Plaintiffs contend, tip their hand and demonstrate their motive to copy.  As the information cited by Defendants makes clear, the 7.5 inch barrel length was required by the military in order to balance the needs of soldiers for accuracy, power, and convenience of use.  O'Meara Decl., Exh. B., Item 8.  Plaintiffs do not rebut this argument.  Plaintiffs only argue that other lengths are available.  Pl. Br. Opp. Summ. J. at 31-32.  Of course other lengths are available, but changes in barrel length will alter the accuracy and power of the revolver.  Accordingly, the length of the barrel by itself is deemed functional.

With respect to other features of the barrel, the answer is not as clear.  Defendants contend that the rounded shape aids in holstering.  Def. Br. Supp. Summ. J. at 37.  Plaintiffs do not address this argument, but instead point to other possible shapes and testimony from Defendants' witnesses suggesting that were it not for their desire to manufacture replicas they would have been able to use those designs.  Pl. Br. Opp. Summ. J. at 31-32.  Plaintiffs also point to the arbitrary positioning of their rollmark as part of their trade dress.  Id.  Accordingly, with respect to these features, there are questions of fact which must be resolved at trial.

xi.    The shape, style, and finish of the steel cylinder:

As with all of the features of Plaintiffs' revolver, the cylinder serves a function.  However, the question to be resolved is whether the design contains arbitrary or fanciful elements that are not essential to the purpose of the feature.  With respect to the cylinder itself, Plaintiffs contend

34

that Defendants could have used "a longer or wider cylinder." Pl. Br. Opp. Summ. J. at 32, citing Gill Decl., Exh. 19, Scheidel Report at ¶ 25. Scheidel's report does not actually state anything to that effect in the paragraph cited and refers only to the decorative grooves and cylinder pin. Accordingly, Plaintiffs do not meet their burden on summary judgment and the shape and size of the cylinder is deemed functional for the purposes of the Ruling. There is, however, a dispute as to the functionality of the flutes on the cylinder. Defendants allege that the fluting improves balance, allows for heat dissipation, and provide a surface for turning the cylinder. Def. Br. Supp. Summ. J. at 38. Plaintiffs do not dispute that the flutes serve a purpose, but assert that having the same number of flutes, or even any flutes at all is not a mechanical necessity. Pl. Br. Opp. Summ. J. at 32. Accordingly, this issue cannot be resolved here.

### xii.    The shape, style, and finish of the cylinder pin:

Defendants argue that in addition to being generally functional, the specific design features of the cylinder pin are functional as well. In particular, Defendants allege that the "ribbed detail and design of the pin ... provide a surface to grasp when removing the pin from a dirty, oily revolver." Def. Br. Supp. Summ. J. at 38. Plaintiffs counter that some of the features are arbitrary and that other designs would have been acceptable but for Defendants' purpose to copy Plaintiffs. Pl. Br. Opp. Summ. J. at 33. The functionality of this particular feature cannot therefore be resolved at summary judgment.

### xiii.    The shape, style, and finish of the ejector rod and ejector rod housing:

Defendants again point to the ease with which the gun can be holstered based on the specific shape of the features here at issue as well as the possibility of overall greater ease of use.

35

Def. Br. Supp. Summ. J. at 39.  Plaintiffs once more simply point to the existence of alternative designs without elaborating on their relative merit compared to the features as they exist on the revolvers at issue.  Pl. Br. Opp. Summ. J. at 33, citing Pl. Exh. Opp. Summ. J., Gill Decl., Exh. 19, Scheidel Report at ¶ 26 ("Defendants could have designed these at least slightly differently from [Plaintiffs'], but chose not to").  While this is not exactly strong evidence of nonfunctionality, Defendants' evidence in favor of functionality is similarly weak.  See Def. Exh. Supp. Summ. J., Fortner Decl., Exh. 45, Scheidel Depo. at 144 (discussing "stories" that he heard about the difficulty of holstering prior to the design at issue) and Exh. 14, Reissig Depo. at 117 (acknowledging the possibility that other designs might get snagged).  Accordingly, summary judgment as to the functionality of this feature is inappropriate.

xiv.     Functionality of trade dress considered as a whole:

It is clear that there are functional elements to every aspect of Plaintiffs' revolver.  There are, however, also numerous factual disputes as to the functionality of individual features.  If there are factual disputes as to the individual elements, then it follows that there would be a factual dispute as to whether these individual features add up to a functional whole.  Considering these disputes, it is inappropriate to render summary judgment on the question of functionality.  Defendants' Motion on this basis is **denied**.

b.     Aesthetic Functionality:

If "a design's aesthetic value lies in its ability to confer a significant benefit that cannot practically be duplicated by the use of alternative designs, then the design is functional."  Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 170, 115 S. Ct. 1300, 131 L. Ed. 2d 248 (1995) (citation and quotations omitted).  Thus, the "ultimate test of aesthetic functionality ... is

whether the recognition of trademark rights would significantly hinder competition." Id. (citation and quotations omitted); see also TrafFix, 532 U.S. at 33 (noting the difference between the aesthetic functionality discussion in Qualitex that necessitates looking to "competitive necessity" versus the traditional Inwood analysis that does not require such an inquiry); and Landscape Forms, 70 F.3d at 253 (citing the rule in Qualitex as the appropriate test for assessing aesthetic functionality).

Defendants argue that Plaintiffs' revolver is aesthetically functional because they and other replica makers would no longer be able to make replicas of the revolvers in question and they would no longer be able to meet the "consumer need" of those such as cowboy action shooters who seek historically accurate revolvers but cannot afford to purchase Plaintiffs' revolvers. Def. Br. Supp. Summ. J. at 43. The argument is baseless. Assuming that Plaintiffs' trade dress is otherwise protectable, the fact that such protection would shut down a replica industry that is infringing Plaintiffs' trade dress is not a reason to find aesthetic functionality. However, most determinative is that the question of aesthetic functionality explicitly turns on the existence of design alternatives. As discussed in the prior section, there are significant questions of fact surrounding the existence of design alternatives. Plaintiffs have continually maintained that there are other possible designs for single action revolvers. Defendants advance no new arguments with respect to those questions now, thus as summary judgment was inappropriate with respect to utilitarian functionality, it is as to aesthetic functionality. Defendants' Motion on this ground is **denied**.

> 5.     Evidence of the Likelihood of Customer Confusion:

"Likelihood of confusion exists when customers viewing the mark would probably

assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." Clicks Billiards, Inc. v. Sixshooters Inc., 251 F.3d 1252, 1265 (2d Cir. 2001) (citation omitted). "In determining a likelihood of confusion, it has long been the practice of this Circuit to apply the multi-factor balancing test articulated by Judge Friendly in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961)." New Kayak Pool Corp. v. R&P Pools, Inc., 246 F.3d 183, 185 (2d Cir. 2001). This involves looking at 1) actual confusion, 2) sophistication of the buyers, 3) strength of the mark, 4) degree of similarity between the two marks, 5) proximity of the products, 6) the likelihood that the prior owner will bridge the gap between its product and the alleged infringer's, 7) Defendants' good faith in adopting its own mark, and 8) the quality of Defendants' product. Polaroid, 287 F.2d at 495. The court must also make an aggregate assessment. Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 219 (2d Cir. 2003). In balancing the factors, "[n]o one of the Polaroid factors is dispositive, and the list is not exhaustive..." Estee Lauder v. Gap, Inc., 108 F.3d 1503, 1510 (2d Cir. 1997). Thus, while "the application of the Polaroid test need not be rigid, it is nevertheless incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why." New Kayak Pool, 246 F.3d at 185. Whether there is a likelihood of confusion is "usually a question of fact." Mana Prods. v. Columbia Cosmetics Mfg., 65 F.3d 1063, 1069 (2d Cir. 1995) (citation omitted). "[S]ummary judgment in a trademark action may be appropriate in certain circumstances, where the undisputed evidence would lead only to one conclusion as to whether confusion is likely." Cadbury Beverages v. Cott Corp., 73 F.3d 474, 478 (2d Cir. 1996) (citations omitted).

     Plaintiffs contend that this Court already found that "the similarities of the revolvers raise

'genuine issues of material facts as to the likelihood of product confusion'" and that this finding

precludes further consideration of confusion now.  Pl. Br. Opp. Summ. J. at 41, citing Ruling on

Motion for Partial Summary Judgment at 5.  Plaintiffs mischaracterize that Ruling.  The Ruling

only addressed the dispositive nature of product labels as they pertain to confusion in this case.

Accordingly, it has no bearing on the questions now at issue and the Polaroid analysis must be

performed.

a.    Evidence of Actual Confusion:

For the purposes of trade dress infringement, "actual confusion means consumer

confusion that enables a seller to pass off his goods as the goods of another." Sports Auth. v.

Prime Hospitality Corp., 89 F.3d 955, 963 (2d Cir. 1996) (citation and quotation omitted).

"Actual consumer confusion often is demonstrated through the use of direct evidence, e.g.,

testimony from members of the buying public, as well as through circumstantial evidence, e.g.,

consumer surveys or consumer reaction tests." PPX Enters. v. Audiofidelity Enters., 818 F.2d

266, 271 (2d Cir.1987) (citation omitted).  The parties dispute the significance of demonstrating

actual confusion for showing a likelihood of confusion.  Plaintiffs argue that demonstrating

actual confusion is not strictly necessary.  Pl. Br. Opp. Summ. J. at 43.  Defendants argue that

without demonstrating instances of actual confusion, courts can properly infer a lack of any

likelihood of confusion.  Def. Br. Supp. Summ. J. at 49.  The law on the subject is somewhat

unclear.  See McGregor-Doniger, Inc. v. Drizzle, Inc., 599 F.2d 1126, 1130 (2d Cir. 1979)

("While a plaintiff need not prove actual confusion in order to prevail [citation omitted] "it is

certainly proper for the trial judge to infer from the absence of actual confusion that there was

also no likelihood of confusion").  However, because Plaintiffs offer evidence of actual

39

confusion, it is unnecessary to reach this question.

Most notably[12] Plaintiffs submit a survey conducted by Dr. Warren Keegan, which purportedly "found significant affirmative misidentification, in that consumers shown photographs of Defendants' revolver with all markings in plain view identified the maker as Colt." Pl. Br. Opp. Summ. J. at 45. Furthermore, they argue that the "survey also found *forty* percent of all respondents believed that the guns are made by the same company, or believed the makers to be affiliated, connected or associated." Id.

Defendants, however, challenge the reliability and admissibility of this survey on numerous grounds. See Def. Br. Supp. Summ. J. at 51-54 and Def. Br. Opp. Summ. J. at 27-59. Defendants' challenges lead to Plaintiffs' submission of a Declaration by Keegan in response to Defendants' claims [Doc. No. 186]. Defendants' in turn moved to strike this Declaration and in the alternative requested leave to submit a rebuttal expert report [Doc. No. 186].

While not articulated as such, Defendants' arguments resemble arguments based on Rule 702 of the Federal Rules of Evidence. See Fed. R. Evid. 702 (setting forth procedures for challenging the admissibility of expert testimony based on the expert's qualifications and the quality of his/her work); see also United States v. Dukagjini, 326 F.3d 45, 52 (2d Cir. 2002) (Stating that Rule 702 "incorporates the Supreme Court's guidelines for reliability of expert

---

[12]    Plaintiffs also submit anecdotal evidence from one consumer claiming that he bought Defendants' product believing it to be Plaintiffs'. Pl. Br. Opp. Summ. J. at 43-44. While such evidence is in theory admissible, it is also within a court's discretion to exclude it. Nora Beverages, 269 F.3d at 124. No such ruling is necessary here. One consumer testimonial does not raise a question of fact on summary judgment. Without Plaintiffs' survey there is no question of fact as to actual confusion. However, with Plaintiffs' survey evidence, there clearly is a question of fact on actual confusion. The consumer testimonial is therefore peripheral to this discussion and there is no need to rule on its admissibility here. As a consequence, Defendants' Motion to Strike [Doc. No. 193] is **denied** without prejudice to renew at trial if Plaintiffs intend to introduce the testimonial as evidence.

testimony set forth in <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 125 L. Ed. 2d 469,

113 S. Ct. 2786 (1993)").  Indeed, Plaintiffs' primary argument in support of the submission of

Keegan's Declaration is that Defendants have advanced a "<u>Daubert</u>-like" challenge and that such

a declaration would be an appropriate response to the challenge.  Def. Br. Opp. Mot. to Strike at

2-5.

     Regardless of the merit of this argument, Defendants do not characterize their arguments

as such and cite no authority involving Rule 702.  Accordingly, Plaintiffs arguments to that effect

are unavailing.  Defendants reference Fed. R. Evid. 403 and conclusorily assert that the probative

value of Keegan's survey is outweighed by its prejudicial effect.  Def. Br. Opp. Summ. J. at 32.

Indeed, under certain circumstances, there is support for excluding surveys on that basis.  <u>See</u>

<u>Starter Corp. v. Converse, Inc.</u>, 170 F.3d 286, 297 (2d Cir. 1999) ("We hold that the district court

did not abuse its discretion in finding that any probative value of the survey was outweighed by

its potential to confuse the issues in the case").  Yet, Defendants also rely on cases elaborating on

hearsay objections to survey evidence.  In particular, the case Defendants rely on most heavily,

<u>Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.</u>, 559 F. Supp. 1189 (E.D.N.Y. 1983), cites to

rules applicable to a hearsay objection.  <u>See</u> <u>Toys "R" Us</u>, 559 F. Supp. at 1205 (discussing

necessity and genuine guarantees of trustworthiness as a bases for admitting survey evidence and

citing to what is now Fed. R. Evid. 807, the residual hearsay exception); <u>see also</u> <u>Starter Corp</u>,

170 F.3d at 297 (citing <u>Toys "R" Us</u> in the context of Fed. R. Evid. 807 and the residual hearsay

exception).  As the majority of Defendants' analysis is formulated pursuant to the discussion in

<u>Toys "R" Us</u>, while not explicitly invoking a hearsay objection, this is the primary basis for their

objection.[13]  The distinction may be academic when it comes to the analysis in this case, but the

statutory basis for finding admissibility is not insignificant.  See Schering Corp. v. Pfizer Inc.,

189 F.3d 218, 227 (2d Cir. 1999) (noting the confusion that the trend of failing to cite to a

statutory base concerning the admissibility of survey evidence has engendered).

   Toys "R" Us employs a seven factor test of the trustworthiness and admissibility of

survey evidence.  559 F. Supp. at 1205.  It is not clear from Defendants' brief that this is the

necessary test.  See Schering Corp., 189 F.3d at 225 (citing Toys "R" Us factors with apparent

approval, without adopting them).  The Second Circuit has discussed three general theories for

admitting survey evidence over a hearsay objection: the state of mind exception, the residual

hearsay exception under Rule 807, and the party admission theory.  Id. at 227-39.

   To be admissible under Rule 807, the evidence must "fulfill five requirements:

trustworthiness, materiality, probative importance, the interests of justice and notice."  Id. at 231

(citation omitted).  The classic risks the hearsay rule addresses are those of "(1) insincerity, (2)

faulty perception, (3) faulty memory and (4) faulty narration."  Id. at 232.  Survey evidence is

susceptible to all these risks as well as an additional class of risk stemming from the fact that

"parties usually offer surveys to support statistical inferences."  Id. at 233.  Such inferences can

be manipulated through "artful data collection or presentation" and exacerbated through

methodological errors.  Id.  A methodologically sound survey can reduce this danger as well as

the danger of insincerity and faulty narration by employing interviewers who lack knowledge of

the litigation and posing questions in a "clear, precise and non-leading manner."  Id. at 233-34;

---

[13]   Defendants do not argue that the test formulated by Toys "R" Us in the hearsay context is equally
applicable to a Rule 403 objections.  Accordingly, this analysis will proceed under the statutory
framework under which the test cited was formulated.

see also Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F. Supp. 670, 684 (E.D.N.Y. 1963) (The

danger of insincerity is raised even "if the interviewers asked fair questions in a leading

manner").  "The only risks that proper survey methodology does not tend to mitigate are those of

faulty memory and perception." Schering Corp., 189 F.3d at 234.  Nevertheless, "a particular

memory survey, which, for example, relates to events that were learned by direct perception and

are unlikely to be forgotten, can, if properly conducted, minimize all five of the classes of risks

ordinarily associated with survey evidence." Id. (citations omitted).

Defendants' arguments go to the issue of relating trustworthiness to probative value (and

thus prejudice) allegedly suggested by virtue of the survey's untrustworthiness.  See Def. Br.

Opp. Summ. J. at 33 (discussing the reliability and trustworthiness of the survey).  Plaintiffs

assert the trustworthiness of the survey and offer no other basis for admissibility.  Thus, without

adopting the Toys "R" Us factors as the rule in this case, Defendants' reliance on those factors

will be considered as they weigh on the trustworthiness of the survey and in turn its admissibility

under the residual hearsay exception.

i.    The survey universe:

The survey universe refers to the population sample chosen for the survey by those

administering it.  Keegan's survey was conducted in gun shops and participants were chosen

based on whether they said they might purchase a handgun within the next five years.

Defendants contend that Keegan's survey failed to achieve a relevant consumer group.

First, Defendants allege that the survey should have focused specifically on Defendants'

customers and not potential purchasers of handguns in general.  Def. Br. Opp. Summ. J. at 36-37,

citing Hutchinson v. Essence Communications, Inc., 769 F. Supp. 541, 546 (S.D.N.Y. 1991) ("In

43

evaluating confusion in a trademark infringement case, it is important to remember that the courts are dealing with confusion as to source, and that the only 'relevant population' is potential purchasers of the junior user's goods or services"), compare Sterling Drug v. Bayer AG, 14 F.3d 733, 741 (2d Cir. 1994) (When "the relevant issue is whether consumers mistakenly believe that the senior user's products actually originate with the junior user, it is appropriate to survey the senior user's customers").  In this case, Defendants contend the market would be cowboy action shooters.  Id. at 37.  Plaintiffs respond that such market differentiation does not exist and Plaintiffs' customers overlap Defendants'.  Pl. Reply Br. Supp. Summ. J. at 5-6.

Defendants also contend that by focusing on individuals who may buy a handgun within five years, the survey universe is overbroad as reaching purchasers of any handgun, not single action revolvers like the ones at issue, and because five years is too open-ended requiring those surveyed to predict their behavior rather than having concrete planned action.  Def. Br. Opp. Summ. J. at 37-41.  Plaintiffs respond that the survey purpose was to predict future buying behavior and that five years is an appropriate time frame to predict such behavior.  Pl. Reply Br. Supp. Summ. J. at 6.

### ii.     Whether the questions posed were leading:

Defendants contend that the questions in Plaintiffs' survey were leading and biased.  In particular Defendants point to survey questions which, after being shown pictures of either both revolvers, logos, or being asked whether participants were familiar with the names "Peacemaker" and "Peacekeeper," the participants were asked if they thought the makers of the two products were in any way related.  See Fortner Decl., Exh. 50: Expert Report of Keegan, Exh. 5, Survey A, at p. 2 (questions 9-10), p. 3 (questions 19-20), p. 5 (questions 26-27) and Survey B, at p. 2

44

(questions 7-8), page 3 (questions 15-16), page 5 (questions 21-21).  Plaintiffs argue, without

conceding the questions are biased, that excluding these questions, the survey validly evidences

actual confusion.  Pl. Reply. Br. Supp. Summ. J. at 6-7.

### iii.     Approximating market conditions:

Defendants argue that the survey fails to approximate actual market conditions as to

potential consumers by showing participants photographs and not the actual revolvers and by

allowing only a few seconds to view the photographs.  Def. Br. Opp. Summ. J. at 52-56.

Plaintiffs do not directly respond to this argument.  They cite a case finding a similar survey

involving pictures and similar lines of questioning as admissible.  Pl. Reply Br. Supp. Summ. J.

at 7, citing McGraw-Edison Co. v. Walt Disney Productions, 787 F.2d 1163, 1172-73 (7th Cir.

1986).

### iv.     Other Alleged Methodological Deficiencies:

Defendants argue that Keegan's participation in the survey, by personally conducting 18

surveys with his son conducting an additional 20, was impermissible and that the failure to utilize

controls rendered the survey results suspect.  Def. Br. Opp. Summ. J. at 35-36 and 41-42.

Plaintiffs argue that controls were unnecessary and that Keegan's participation in the survey was

not impermissible and in any event harmless.  Pl. Reply Br. Supp. Summ. J. at 5-6.

### v.     Conclusion as to admissibility:

Defendants raise serious questions about the trustworthiness of the survey.  As discussed

above, participation in the administration of the survey by those with knowledge of the litigation

and the use of leading questions raise the risk of insincerity in responses and cast doubt on the

trustworthiness of the survey.  Schering Corp., 189 F.3d at 233-34.  The questions challenged as

leading clearly are both in form and in context (i.e. considering the preceding questions).

Furthermore, Keegan and his son should not have administered the survey.

To be reliable surveys "must rely upon responses by potential consumers of the products in question." Dreyfus Fund, Inc. v. Royal Bank of Canada, 525 F. Supp. 1108, 1116 (S.D.N.Y. 1981). In this sense, the time frame for potential purchases is also troubling. While it is permissible to attempt to predict future behavior using surveys, five years is a long time that risks mere speculation on the part of those surveyed. It also raises all of the "classic" concerns about admitting hearsay evidence. See Id. at 232. Furthermore, the fact that Keegan's survey was geared only towards those purchasing a handgun (and not this particular type of handgun or even "historic" guns in general) casts doubt on whether the survey focuses on potential consumers[14] of the product in question, leaving aside Defendants' arguments that consumers of Plaintiffs' or Defendants' revolvers is appropriate .

However, even considering all these arguments together, because the survey focuses on direct perception of the marks, even if through photographs, it approximates "a particular memory survey[,]" Schering Corp., 189 F.3d at 234, and has enough indications of trustworthiness to be admitted over Defendants' objections. Defendants' objections, while serious and could properly convince a fact finder to discount the survey entirely, properly go to the weight of the survey. Accordingly, evidence of actual confusion must weigh in Plaintiffs' favor in the consideration of Defendants Motion for Summary Judgment. Additionally, because

---

[14]     It is not necessary to limit the survey to those who currently identify themselves as shooters or collectors in order to reach the demographic at issue. The survey could have been limited to those who have an interest in shooting or collecting historically accurate guns. Thus, Plaintiffs' arguments that to so limit the survey universe would exclude relevant potential consumers, Pl. Br. Opp. Summ J. at 50, is unavailing.

the additional Keegan Declaration was in response to Defendants' arguments and peripheral to the resolution of Defendants' challenges, Defendants' Motion to Strike [Doc. No. 186] is **denied**.

b.    Customer Sophistication:

It is not disputed that the revolvers at issue, while ranging in price, are a significant investment. See Def. Br. Supp. Summ. J. at 55 (stating price range for single action revolvers from $375 to over $1900). Furthermore, it is undisputed that potential customers will exercise great care in purchasing a revolver. Id. at 55-56. Defendants argue that these facts suggest that customers are not confused between the two brands of revolvers and require a finding that this factor weighs in their favor. Plaintiffs advance two arguments with respect to customer sophistication: 1) that the sophistication of customers alone does not resolve the issue of confusion, and 2) that customer sophistication, while potentially relevant to point of sale confusion, it is not equally relevant towards assessing initial interest confusion, post-sale confusion, and confusion as to source sponsorship or affiliation. Pl. Br. Opp. Summ. J. at 52-53. Plaintiffs' arguments seem a concession that customer sophistication, at least with respect to point of sale confusion, weighs in favor of Defendants. Regardless, as stated above, no one factor in this analysis is dispositive, Estee Lauder, 108 F.3d at 1510, and while customer sophistication may be less relevant outside of point of sale confusion, Plaintiffs have offered no evidence that definitively speaks to this sort of confusion. Accordingly, based on the undisputed facts, this factor must weigh against Plaintiff. However, it should be noted that when "there is a high degree of similarity between the parties' services and marks, the sophistication of the buyers cannot be relied on to prevent confusion." Morningside Group, Ltd. v. Morningside Capital Group, L.L.C., 182 F.3d 133, 143 (2d Cir. 1999).

c.    Strength of the Mark:

"The strength of a mark is its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." Cadbury Beverages, 73 F.3d at 479. Parties focus on the same arguments discussed above with reference to whether Plaintiffs' trade dress has acquired secondary meaning. See Def. Br. Supp. Summ. J. at 56 (discussing market presence of replica makers) and Pl. Br. Opp. Summ. J. at 53-55 (arguing that revolver's appearance is distinctive and recognizable). As above, the parties produce evidence that weighs on both sides of the issue. Accordingly, this factor must be construed in favor of Plaintiffs and suggest that summary judgment is not appropriate.

d.    Degree of Similarity:

Defendants contend that because certain features of Plaintiffs' alleged trade dress do not appear on their revolver, the products are not confusingly similar. See Def. Br. Supp. Summ. J. at 82 (Pointing to differences in the finish of the hammer, the lack of Plaintiffs' rollmark, the "rampant colt" symbol on the frame, and that one of Defendants' revolver, "The Longhorn," does not have similar grips to Plaintiffs'). While this may be, it is also undisputed that Defendants' revolver is intended to be a replica thus suggesting a not insignificant similarity between the two products. Indeed, it would be disingenuous for Defendants to argue that the overall appearance of the revolvers was not at all similar. This does not of course necessitate a finding of likelihood of confusion or infringement, but certainly bears on this factor of the analysis. See McGregor-Doniger, Inc. v. Drizzle, Inc., 599 F.2d 1126, 1133 (2d Cir. 1979) ("Similarity in and of itself is not the acid test. Whether the similarity is likely to provoke confusion is the crucial question"). Nonetheless, the products are superficially similar enough that this factor must count

48

against Defendant.

                     e.       **Market Proximity and Likelihood that Prior Owner will Bridge the Gap:**

Market proximity refers to the "likelihood that customers may be confused as to the source of the products, rather than as to the products themselves." Charles of Ritz Group, Ltd. v. Quality King Distributors, Inc., 832 F.2d 1317, 1322 (2d Cir. 1987). As such, proximity necessitates looking at "whether and to what extent the two products compete with each other and the nature of the products themselves and the structure of the relevant market." Morningside Group, 182 F.3d at 140. Plaintiffs argue that because the products are often sold in the same locations, this establishes that the products compete in the same market. Pl. Br. Supp. Summ. J. at 29. Defendants acknowledge that the products share some "of the same channels of trade," but argue that price differentials place them in different markets and that price difference is a salient factor for the relevant consumers, which helps them distinguish replicas from Plaintiffs' revolvers. Def. Br. Opp. Summ. J. at 20. In considering this factor, differences in price alone may be "insufficient to establish competitive distance." McGregor-Doniger, 599 F.2d at 1132, n. 5. Bridging the gap looks to whether the senior user intends to enter the market of the junior user and protects "the senior user's interest in being able to enter a related field at some future time." Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 874 (2d Cir. 1986) (citation omitted). Plaintiffs assert that they have already "bridged the gap" between the products by introducing an "economy" version of the Peacemaker revolver, the Cowboy. Pl. Br. Supp. Summ. J. at 30. Plaintiffs therefore contend that they have already bridged the gap. Defendants response that this gap was already filled by other replica makers, Def. Br. Opp. Summ. J. at 20-

21, misses the point of preserving the senior users ability to expand.  Considering that Defendants' arguments center entirely around price differentials and how that affects and creates consumer groups (e.g. cowboy action shooters), and given the at least colorable evidence of slippage in these differentials, summary judgment is not appropriate.

f.      Defendants' Good/Bad Faith:

"[E]vidence of intentional copying raises a presumption that the second comer intended to create a confusing similarity." Charles of Ritz Group, 832 F.2d at 1322.  However, it must be remembered that "intentional copying is not a requirement under the Lanham Act" and that "intent is largely irrelevant in determining if consumers likely will be confused as to source." Lois Sportswear, U.S.A., 799 F.2d at 875.  As a consequence, "this factor alone is not dispositive," but it "bolsters a finding of consumer confusion." Charles of Ritz Group, 832 F.2d at 1322.  It is undisputed that Defendants' products are replicas of Plaintiffs' revolvers.  This suggests intentional copying and thus a finding of bad faith.  Defendants, however, argue that the existence of other replicas and the belief that the features were either generic or functional mitigates against this finding.  Def. Br. Supp. Summ. J. at 90.  Furthermore, as discussed above, Defendants have consistently maintained that they target consumers such as cowboy action shooters who cannot or would not want to spend the money necessary to purchase Plaintiffs' products.  Accordingly, Defendants assert that they are simply attempting to compete (not confuse) by offering a lower priced alternative to Plaintiffs' revolvers.  Def. Br. Supp. Summ. J. at 90; see also George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1541 (2d Cir. 1992) ("Absent confusion, imitation of certain successful features in another's product is not unlawful and to that extent a 'free ride' is permitted") (citation omitted).  This factor does not weigh in

50

Defendants' favor on summary judgment. There is however a factual question as to whether Defendants' conduct constitutes a bad faith effort to confuse or simply an attempt to compete. It is up to a fact finder to credit or discredit this account. Accordingly, summary disposition is inappropriate.

g.    Quality of Defendants' Product:

The parties dispute whether there is actually a difference in quality between the revolvers. See Pl. Br. Opp. Summ. J. at 43 (arguing that Defendants have admitted the inferior nature of their product) and Def. Br. Opp. Summ. J. at 27 (arguing that any difference goes to cosmetics, not quality/performance). Assuming however that there is a difference in quality, both parties dispute the legal significance such a concession. Compare Charles of Ritz Group, 832 F.2d at 1323 ("This marked difference in quality lessens the likelihood of consumers' misapprehending the source of either product") with Morningside Group, Ltd., 182 F.3d at 142 ("Under this factor a court first examines whether defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two"). There is, of course, no dispute that there is a difference in price between the revolvers. Nevertheless, the dispute over quality precludes summary resolution of this factor and it must be resolved by a fact finder.

h.    Aggregate Analysis:

Factual disputes exist on every factor except customer sophistication and degree of similarity which weigh in favor of Defendants and Plaintiffs respectively. Accordingly, the undisputed evidence does not "lead only to one conclusion" and summary judgment in favor of Defendants on likelihood of confusion is not possible. Cadbury Beverages, 73 F.3d at 478. Defendants' Motion on this basis is **denied**.

51

6.    Conclusion as to Trade Dress Claims:

Because Plaintiffs' description of its claimed trade dress is legally sufficient, there are factual questions as to its functionality, and likelihood of confusion, Defendants' Motion for Summary Judgment on Plaintiffs' trade dress claims, Counts One, Two, Seven, and Eight is **denied**.

B.    Plaintiffs' Unregistered "Peacekeeper" Trademark:

Defendants move for summary judgment on Count Five which claims infringement of Plaintiffs' alleged trademark in the name "Peacekeeper." Plaintiffs manufactured and sold a double action revolver under the name "Peacekeeper" from approximately 1985 to 1987. Plaintiff no longer manufactures the revolver, but continues to provide repair services. The revolver is not a western style revolver and is targeted at law enforcement and home defense. It is undisputed that Plaintiffs never registered the "Peacekeeper" trademark.

Defendants argue that Plaintiffs have abandoned any rights they may have had in the Peacekeeper when they ceased producing the revolver in 1987. Def. Br. Supp. Summ. J. at 73-74. Plaintiffs do not dispute that they ceased producing the revolver, nor do they argue that they are planning to resume production of the revolver or have any plans to use the mark "Peacekeeper." Plaintiffs' only argument with respect to abandonment is that because they continue to make repairs, there is "significant evidence of persisting goodwill and consumer association of the 'Peacekeeper' name." Pl. Br. Opp. Summ. J. at 81. With respect to the frequency of these repairs, Plaintiffs only produce evidence that there were two to three repair requests in 2002. Id. This is insufficient. Even the authority Plaintiffs cite to support their position, Ferrari S.p.A. Esercizio Fabbriche Automobili e Corse v. McBurnie, No. 86-1812-B

(IEG), 1989 U.S. Dist. LEXIS 13442 (U.S. Dist. , 1989), at *18-19 (S.D. Cal. June 5, 1989), involves substantially different facts in which the manufacturer produced evidence of repairs for at least 10 years prior to the lawsuit. Accordingly, Plaintiffs have abandoned any rights they may have had and Defendants' Motion for Summary Judgment as to Count Five is **granted**.

      C.    Plaintiffs' Registered "Peacemaker" and "Rampant Colt" Trademarks:

      Parties submit cross-motions for summary judgment as to Counts Three and Four dealing with Plaintiffs' registered "Peacemaker" and "Rampant Colt" trademarks. Plaintiffs claim that Defendants "Peacekeeper" mark infringes on their "Peacemaker" mark and that Defendants' running horse style unregistered mark infringes on their "Rampant Colt" registered mark.

      There are two distinctions between the marks at issue now and Plaintiffs' trade dress claims discussed above: 1) the two marks are not product designs; and 2) Plaintiffs' marks are both registered. Because product designs are not at issue, there is no prohibition on Plaintiffs' marks being inherently distinctive. See Wal-Mart Stores, 529 U.S. at 215 (stating rule that trade dress protection for product designs cannot be inherently distinctive). More significantly, however, a certificate of registration "is prima facie evidence of the validity of the registration, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the mark in commerce on the goods or services specified therein." Goya Foods, Inc. v. Tropicana Products, Inc., 846 F.2d 848, 854 (2d Cir. 1988). This establishes a presumption in favor of the mark's validity and shifts the burden of persuasion to the Defendant to contest the mark's validity. Chere Amie, Inc. v. Windstar Apparel, Corp., 191 F. Supp. 2d 343, 347 (S.D.N.Y. 2001). Indeed, Defendants do not dispute the validity of the marks. The presumption does not however effect Plaintiffs' burden to demonstrate a likelihood of confusion. Thus, the parties' arguments for

summary judgment center on the likelihood of confusion. The factors necessary to consider in addressing confusion are the same as those discussed above with reference to Plaintiffs' trade dress claim. See Polaroid Corp., 287 F.2d at 495 (setting forth eight factor test).

      1.      Actual Confusion:

This factor is identical to the issues discussed above. Plaintiffs' survey provides evidence of actual confusion with respect to the marks at issue here. However, given the serious questions as to the weight that it should be afforded, for purposes of the cross motions for summary judgment, there is a question of fact as to actual confusion and this factors weighs in neither party's favor.

      2.      Customer Sophistication:

The discussion necessary under this factor is also identical to the discussion above. Although customer sophistication is not sufficient to resolve the question of confusion on its own, it does weigh in Defendants' favor on summary judgment.

      3.      Strength of the Mark:

The marks here are different than the trade dress discussed above. As a consequence, this factor must now be addressed with respect to the "Rampant Colt" and "Peacemaker" marks. As above, strength is evaluated based on distinctiveness, however, here distinctiveness is measured on a sliding scale from least distinctive to most distinctive: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. TCPIP Holding Co. v. Haar Communs., Inc., 244 F.3d 88, 93 (2d Cir. 2001). Generic marks "identify the type or species of goods or services to which they apply[] [and] are totally lacking in distinctive quality..." Id. "Descriptive marks are marks that describe a product or its attributes. Because they are descriptions, they also lack distinctive

54

quality as marks." Id. "Marks that do not directly describe goods or services or their attributes, but rather are suggestive of them, have some distinctive quality and are thus protected without need to prove secondary meaning." Id. at 94. Finally, "[t]he most distinctive marks, and thus the strongest, are marks that are arbitrary or fanciful" and have no descriptive quality whatsoever. Id.

### a.    "The Peacemaker":

Plaintiffs argue that this mark is arbitrary or, at the very least, suggestive. Pl. Br. Supp. Summ. J. at 24. Defendants, however, produce evidence that the term "Peacekeeper," or substantially similar marks, have been used as a mark both to refer to firearms and to other types of products. Def. Br. Opp. Summ. J. at 22, Parent Decl., Exh. 31. Considered by itself the mark "Peacekeeper" as applied to a revolver is suggestive or arbitrary. However, common usage of the same mark can reduce the strength of the mark and the likelihood of confusion. Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 259-60 (5th Cir. 1980). Nevertheless, when that use is applied to different types of products, "third-party uses and registrations ... merely limit the protection to be accorded plaintiff's mark outside the uses to which plaintiff has already put its mark." Id. at 260. Thus, as Plaintiffs are not seeking protection of their mark outside the revolver market most of the third-party use pointed to by Defendants is irrelevant here. Defendants then only point to two uses of the term "Peacekeeper" in the context of firearms. Def. Br. Opp. Summ. J. at 22. This is hardly extensive use and without more could not reasonably be relied on as undermining the distinctiveness of Plaintiffs' mark. Accordingly, this factor must weigh in Plaintiffs' favor.

### b.    The "Rampant Colt":

Again, this is a mark that is in no way descriptive and taken on its own is arbitrary or

55

fanciful. Defendants, however, claim that horse symbols are used even more often among western style firearms. Def. Br. Opp. Summ. J. at 22-23. Defendants further argue that Plaintiffs' failure to police these uses has resulted in a weakening of the mark. Id. at 23. The mere use of a horse in a mark is not sufficient to weaken all other marks that involve horses. Defendants attempt to cast Plaintiffs' claims in an overbroad manner such that if they are afforded protection all other manufacturers will be precluded from using horse symbols on their firearms. This conclusion is of dubious value, nevertheless, it need not be examined as Defendants fail to produce enough evidence to suggest that similarly styled marks have weakened Plaintiffs' registered mark. The inclusion of a couple photographs of replica grips, see e.g. Parent Decl., Exh. 20 and 30, is simply not enough. Accordingly, this factor weighs in Plaintiffs' favor.

### 4.    Similarity of the Marks:

The parties, not surprisingly, take wildly diverging positions on this factor. See Def. Br. Opp. Summ. J. at 7-13 and Pl. Br. Supp. Summ. J. at 27-29. Suffice it to say that the two marks are not so dissimilar that it is impossible to reasonably anticipate consumer confusion, but neither are they so similar that the conclusion of consumer confusion is unavoidable or even predictably likely. Accordingly, the resolution of this question lies within the province of the fact-finder and cannot be resolved on summary judgment. Considering that cross-motions have been filed this factor must be construed in favor of neither party.

### 5.    Proximity of the Products and the Likelihood of Bridging the Gap:

The analysis with respect to the marks "Peacekeeper" and "Rampant Colt" is the same as that pertaining to Plaintiffs' trade dress claims. Because there was a dispute of fact with respect

to that discussion, there is also a question of fact here.  This factor falls in favor of neither party.

6.    Defendants' Good/Bad Faith:

As above, "evidence of intentional copying raises a presumption that the second comer intended to create a confusing similarity."  Charles of Ritz Group, 832 F.2d at 1322.  However, here Plaintiffs point to no direct evidence of intentional copying of and rely on evidence that Defendants intended to create a replica of Plaintiffs' revolvers to support the inference that Defendants must also have intended to copy Plaintiffs' "Peacekeeper" and "Rampant Colt" marks. Pl. Br. Supp. Summ. J. at 33-35.  While this may raise the question of bad faith, it does not resolve it.  Defendants claim that there was no intent to copy and cite the alleged differences between the marks and that, at least with respect to their horse symbol, the design was conceived without reference to Plaintiffs'.  Def. Br. Opp. Summ. J. at 9.  This coupled with the previous discussion of the questions surrounding Defendants' bad faith preclude summary disposition of this factor.

7.    Quality of the Products:

The parties address this factor as it applies to the products the marks designate and not the marks themselves.  Accordingly, there is nothing to add to the analysis as it pertained to Plaintiffs' trade dress.  Because the parties dispute whether there is a difference in quality, there is a similar question of fact here.

8.    Conclusion as to Likelihood of Confusion:

The bulk of the factors do not weigh in either parties' favor, but rather weigh against both for the purposes of summary judgment.  Accordingly, the likelihood of confusion between Plaintiffs' and Defendants' marks cannot be resolved here and both Plaintiffs' and Defendants'

Motions for Summary Judgment are **denied** with respect to Counts Three and Four.

D.    Plaintiffs' Unregistered "Armsmear Crest":

In Count Six of their Amended Complaint, Plaintiffs claim infringement of their unregistered Armsmear Crest mark, which is the family crest of Plaintiffs' founder Samuel Colt. See Pl. Br. Opp. Summ. J. at 79.  Defendants move for summary judgment on this Count.

Defendants argue that their running horse symbol is not similar to the Armsmear Crest and that even if it was, Plaintiffs' use of the crest does not establish exclusivity, see Def. Br. Supp. Summ. J. at 83 n. 37 (Plaintiffs have used the crest less than 50 times on customized orders), and as Plaintiffs' survey does not involve the crest, there is no evidence establishing a likelihood of confusion.  Id. at 84.  Plaintiffs counter that the crest has been associated with Colt since 1851 and that their use has been exclusive which suggests strength.  Pl. Br. Opp. Summ. J. at 80.  The moving party in a motion for summary judgment may point to a lack of evidence concerning an issue the non-moving party will bear the burden of persuasion on at trial can satisfy the moving party's burden, Legg, 228 F. Supp. 2d at 56, citing Celotex, 477 U.S. at 322, but Defendants only point to a lack of evidence as to actual confusion and dispute the strength of Plaintiffs' mark.  These are but two factors in the likelihood of confusion analysis.  Even assuming a lack of evidence of these points, Defendants are not necessarily entitled to summary judgment because the other factors must be considered.  See New Kayak Pool, 246 F.3d at 185 (While "the application of the Polaroid test need not be rigid, it is nevertheless 'incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why").  Defendants arguments are not sufficient to allow for such an inquiry. As a consequence, Defendants' Motion for Summary Judgment on Count Six is **denied**.

58

E.    Defendants' Affirmative Defenses and Counterclaims:

1.    Acquiescence:

Defendants assert the affirmative defense of acquiescence and move for summary judgment on that ground.  Plaintiffs cross-move for summary judgment on the ground that Defendants are not entitled to an acquiescence defense.

Acquiescence "requires proof of three elements: (1) the senior user actively represented that it would not assert a right or a claim; (2) delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice."  Times Mirror Magazines, Inc. v. Field & Stream Licenses Co., 294 F.3d 383, 395 (2d Cir. 2002) (citation omitted).  A finding of delay is central to this defense.  Profitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C., 314 F.3d 62, 67 (2d Cir. 2002).  While a plaintiff may not simply sleep on its rights, there is no obligation to sue until the threat of confusion "looms large" and the right to protection has "clearly ripened."  Id. at 68 (citation omitted).

In this case, Defendants allege that Plaintiffs were on notice as to Defendants intentions as early as April 1999 when a meeting took place between representatives from Plaintiffs' company and Defendants'.  Def. Br. Supp. Summ. J. at 77.  Defendants brought to the meeting an example of the replica revolver they were planning to sell.  Id.  Another meeting took place in 1999 and then in January of 2000, Defendant RJG displayed one of Defendants' replicas at the SHOT Show in Las Vegas.  Id. at 77-78.  In February and March of 2000 Defendants sent letters to Plaintiffs advising them of their efforts to manufacture replicas.  Id. at 78.  Defendants entered the market in June or July of 2000.  Pl. Br. Opp. Summ. J. at 77.  In the spring of 2001, Plaintiffs

59

sent Defendants a cease and desist letter, filing suit in January of 2002.  Id.  Defendants argue that the failure to raise the issue of infringement in the parties' several meetings constituted a representation that Plaintiffs would not assert a claim and that the period of delay between the meetings and Plaintiffs lawsuit constituted a prejudice.  Def. Br. Supp. Summ. J. at 78-79.

Regardless of whether failure to raise the issue of infringement at the meetings constituted a representation that Plaintiffs would not assert a right, Plaintiffs delay is not unduly prejudicial.  As cited, Plaintiffs were not under any obligation to file suit or assert their rights until ripe.  Plaintiffs' claims were certainly not ripe prior to Defendants' entry into the market  and thus Plaintiffs' delay was for a period of less than two years.  This delay is not unduly prejudicial as a matter of law.  Many statute of limitations allow a party two years to assert their claim by filing suit.  Defendants' Motion for Summary Judgment based on a defense of acquiescence is **denied** and Plaintiffs' Motion for Summary Judgment on Defendants' acquiescence defense is **granted**.

2.    Plaintiffs' Entitlement to Monetary Damages:

Defendants move for summary judgment on the question of damages, arguing that based on the facts involved, Plaintiffs have no entitlement to monetary damages.

Generally under Section 35 of the Lanham Act a plaintiff is entitled, "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C.S. § 1117(a) (LEXIS 2004).  However, to recover any damages Plaintiffs must be able to prove "actual consumer confusion or deception resulting from the violation ... or that the defendant's actions were intentionally deceptive thus giving rise to a rebuttable presumption of consumer confusion."  George Basch Co. v. Blue Coral, Inc., 968 F.2d

1532, 1537 (2d Cir. 1992) (citations omitted).  Plaintiffs have already raised a question of fact as to actual confusion with their survey evidence, thus, summary disposition of their entitlement to damages is not appropriate on that basis.  Similarly, there is a question of fact as to whether Defendants' conduct was intentionally deceptive.  While Defendants surely intended to produce replicas, they have consistently maintained that they are attempting to compete, not deceive, by targeting a different consumer demographic, that consumers know the difference between their revolvers and Plaintiffs', and that their revolvers are readily identifiable through the use of their rollmark.  Whether these arguments are to be credited is not a question for summary judgment. Thus, Defendants' Motion for Summary Judgment on damages under the Lanham Act is **denied**.[15]

### 3.    Damages Under the Connecticut Unfair Trade Practices Act (CUTPA):

Under the CUTPA, Plaintiffs may be entitled to recover actual damages, punitive damages, reasonable attorney's fees, or other equitable relief.  Conn. Gen. Stat. § 42-110g(a) and (g) (LEXIS (2004).  Defendants conclusorily argue based on their discussion of damages under the Lanham Act, that damages cannot be awarded under the CUTPA.  Def. Br. Supp. Summ. J. at

---

[15]    Assuming arguendo that the analysis could proceed past the question of actual confusion, Plaintiffs' briefing on the issue of entitlement to profits is incomplete.  There are three "categorically distinct" bases for awarding Defendants' profits to Plaintiffs, namely, "if the defendant is unjustly enriched, if the plaintiff sustained damages from the infringement, or if the accounting is necessary to deter a willful infringer from doing so again."  George Basch Co., 968 F.2d at 1537 (citation omitted).  However, with respect to all three bases, "a plaintiff must prove that an infringer acted with willful deception before the infringer's profits are recoverable by way of an accounting."  Id. at 1540.  In opposing Defendants' Motion, Plaintiffs focus entirely on whether Defendants' conduct was intentionally deceptive.  Pl. Br. Opp. Summ. J. at 84-85.  While establishing that Defendants' conduct was intentionally deceptive would establish it as willful, Plaintiffs do not take their arguments any farther and as willfulness is an element common to all bases for seeking profits, it is not possible to discern the specific base(s) for Plaintiffs alleged entitlement to Defendants' profits.

92.  As to actual damages, Defendants are presumably invoking their argument that Plaintiffs cannot show actual confusion to demonstrate actual damages under the Lanham Act.  Id. at 89. This argument is unavailing as there is a question of fact surrounding actual confusion.  The standard for awarding punitive damages under the CUTPA is whether the evidence reveals "wanton and malicious injury, evil motive and violence" such that "a reckless indifference to the rights of others or an intentional and wanton violation of [Plaintiffs'] rights" is apparent. Gargano v. Heyman, 203 Conn. 616, 622, 525 A.2d 1343, 1347 (1987) (citations omitted), see also Staehle v. Michael's Garage, 35 Conn. App. 455, 462, 646 A.2d 888, 892 (1994).  Certainly if a jury were to disbelieve Defendants' arguments concerning its good faith an award of punitive damages could be proper.  Assuming all claims are proven, attorney's fees cannot now be precluded.  Accordingly, Defendants' Motion for Summary Judgment on damages under the CUTPA is **denied**.

> 4.     Defendants' False Designation of Origin and Advertising Claims:

Defendants make several separate false advertising claims and one false designation of origin claim.  The parties file cross motions on one of Plaintiffs' false advertising claims - namely that Plaintiffs' revolvers are made in the United States - and Defendants move for summary judgment on all of Defendants' remaining counterclaims.

Under the Lanham Act,

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial

activities by another person, or
(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

15 U.S.C.S. § 1125(a).

In order to establish standing to bring a claim Defendants must

demonstrate a "reasonable interest to be protected" against the advertiser's false or misleading claims, and a "reasonable basis" for believing that this interest is likely to be damaged by the false or misleading advertising. The "reasonable basis" prong embodies a requirement that the plaintiff show both likely injury and a causal nexus to the false advertising.

Havana Club Holding, S.A. v. Galleon, S.A., 203 F.3d 116, 130 (2d Cir. 2000) (citation omitted).

While Defendants here need not be "a direct competitor, it is apparent that, at a minimum,

standing to bring a section 43 claim requires the potential for a commercial or competitive

injury." Id. In other words, there must be more than a "subjective belief" in damages. Ortho

Pharmaceutical Corp. v. Cosprophar, Inc., 32 F.3d 690, 694 (2d Cir. 1994). When the products

are not in direct competition, "a more substantial showing" of injury and causation is required.

Id.

A party asserting a false advertising claim must demonstrate that the challenged statement

is false. "Falsity may be established by proving that (1) the advertising is literally false as a

factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse

customers." NBA v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir. 1997) (citation omitted).

However, "[s]ubjective claims about products, which cannot be proven either true or false, are

not actionable under the Lanham Act." Lipton v. Nature Co., 71 F.3d 464, 474 (2d Cir. 1995).

This extends to claims that are "mere puffing." JR Tobacco of Am. v. Davidoff of Geneva (CT),

957 F. Supp. 426, 432 n. 6 (S.D.N.Y. 1997).

Finally, it must be established that the alleged falsity deals with an inherent quality or characteristic of the product such that consumers would consider it material and influence their purchasing decisions. NBA, 105 F.3d at 855.

a.    "Made in the USA":

In their First Counterclaim, Defendants assert that numerous periodical references (either in advertisements or other stories) to Plaintiffs' Cowboy revolver state that it is made in the U.S.A. and that this designation is false. Def. Br. Supp. Summ. J. at 96-99. Many of the references cited appear in periodicals prior to Defendants' entry into the market in the year 2000. With respect to those references, Defendants lack standing to pursue a claim of false advertising under the Lanham Act. At the time the ads appeared, Defendants were not in direct competition with Plaintiffs. Accordingly Defendants are held to a higher standard with respect to demonstrating injury and causation. The only claim Defendants make is that the references in various periodicals could have "enhanced the public's perception of the Cowboy revolver as 'Made in the USA.' and negatively impacted [Defendants] at the time it was entering the replica revolver market." Def. Br. Opp. Summ. J. at 95. This argument is pure speculation. Defendants produce no specific evidence to back up this claim and it simply does not amount to a "more substantial showing" of either injury or causation. Defendants, therefore, have no standing to assert a claim involving periodical references that appeared before they entered the market.

Defendants also cannot demonstrate injury with respect to those periodical references that appeared after the year 2000. While Defendants conducted a consumer survey that suggests whether a revolver is of domestic origin is an important consideration to many firearms

64

purchasers, Def. Br. Supp. Summ. J. at 99-100, it is undisputed that Defendants' revolvers are of foreign origin. Assuming Plaintiffs' revolvers are not of domestic origin, there is no evidence to suggest that if consumers knew the truth of its origin they would cease to care about the revolvers domestic origin and purchase Defendants' foreign produced revolvers. It is therefore unclear how Defendants are damaged. Plaintiffs may reap some undue benefit, but at best this injures other manufacturers whose products are manufactured in the U.S. and not Defendants. There is no reasonable basis to infer "likely injury" or a "causal nexus." Havana Club Holding, 203 F.3d at 130. Accordingly Defendants have no standing to assert their false advertising/designation of origin counterclaim and their Motion for Summary Judgment is **denied**. Plaintiffs' Motion on the same counterclaim is **granted**.[16]

### b.     Claims of Historical Significance:

In their First Counterclaim, Defendant AWA claims that Plaintiffs's advertising their single action revolvers, in particular the Model P, as the "gun that won the west" is false

---

[16]          Assuming arguendo that Defendants had standing, it is unlikely that they could show that the Cowboy revolver was not made in the United States. The Federal Trade Commission (FTC) has enunciated an "all or virtually all" standard to evaluate made in the U.S.A. claims or origin. See Enforcement Policy on U.S. Origin Claims, available at http://www.ftc.gov/os/1997/12/epsmadeusa.htm (last accessed on March 29, 2004). Under the FTC standard, there is no bright line rule and consideration should be given to 1) the location of final assembly; 2) the portion of total manufacturing costs assigned to the United States; and 3) the degree of removal of the foreign input from the finished product.

          Defendants argue that because the frame, trigger guard, hammer, frontstrap, backstrap, ejector rod, and ejector rod housing are all cast in Canada the revolver is not of domestic origin. Def. Br. Supp. Summ. J. at 99. It is, however, undisputed that the Cowboy revolver is assembled in the United States. Plaintiffs also contend that approximately 12-15% of manufacturing costs can be assigned to foreign sources, thus leaving at least 85% to the United States. Pl. Br. Opp. Summ. J. at 92. Defendants do not provide any evidence to the call into question this statistic. Finally, the revolver is machined, polished, finished, assembled, and packaged in the United States. Id. at 93. Thus, the only part of revolver's manufacturing that is attributable to non-US sources is the initial casting of some of the components of the revolver and the final product is greatly removed from the foreign input. These facts would likely be sufficient to sustain a finding that the revolver is made in the United States.

advertising under the Lanham Act.  See 15 U.S.C. § 1125(a)(1)(B).  Plaintiffs' move for summary judgment on this counterclaim.

Defendants argue that because historical significance is important to consumers purchasing western style revolvers, Plaintiffs' advertising is material and, if false, likely to draw away customers causing injury to Defendants.  Def. Br. Opp. Summ. J. at 96-97.  Defendants argue that it is not true that Plaintiffs' revolvers won the west and that the Winchester 73 rifle is the gun that won the west.  Id. at 97.

Defendants arguments are based on an overly literal interpretation of Plaintiffs' advertising.  The statement is clearly a form of puffing and not entirely susceptible to proof or disproof.  If one is inclined to be so literal, an inanimate object, such as a gun, cannot literally win anything such as a war or the drive to colonize the western region of this country.  While the use of a revolver or rifle may have helped individuals "win the west,"[17] which single firearm was decisive, if any, is not the sort of question subject to resolution.  While any claim may have some basis in fact, the claim of exclusive responsibility is inevitably an exaggeration.  The statement, much like "Energizer Bunny" going on and on or "The Best a Man Can Get" is a form of puffing, not literal truth.  Accordingly, Plaintiffs' Motion for Summary Judgment on this claim is **granted**.

c.    Designation of Origin on Plaintiffs' Rollmark:

 Plaintiffs move for summary judgment on Defendant AWA's Second Counterclaim, which asserts that the rollmark on the barrel of Plaintiffs' revolvers which reads "Colt's Pt. F.A. Mfg. Co. Hfd Conn. USA" is a false designation of origin.  Plaintiffs argue that they are the

---

[17]    As the saying goes, "Guns don't kill people, people kill people..."

corporate descendants of Colt's Patent Firearms Manufacturing Company, the company whose name is abbreviated on the rollmark, and are thus entitled to use the name. Pl. Br. Supp. Summ. J. at 51. Furthermore, they argue that although Plaintiffs maintain their physical presence in West Hartford, their corporate address is in Hartford. Id. Accordingly, Plaintiffs argue that there is nothing untruthful about the rollmark.

Defendants' base their opposition solely on the argument that because Plaintiffs' revolvers have been manufactured in West Hartford and not Hartford, Connecticut since at least 1994, the rollmark is literally false. Def. Br. Opp. Summ. J. at 97. It is noteworthy that the rollmark itself does not represent that the products were actually manufactured in Hartford and could be easily read to reference the corporate address not the manufacturing address. However, even assuming that there is some falsity to the rollmark, Defendants cannot demonstrate materiality. Defendants conclusorily argue that "historical authenticity" is important to consumers of western style revolvers and that one should assume that the difference between Hartford and West Hartford is crucial to that authenticity such that a corporate address in Hartford is not sufficient to establish the appropriate level of authenticity. Id. There is simply no evidence produced to suggest this level of attention to detail. As a consequence, Plaintiffs' Motion for Summary Judgment on Defendants' Second Counterclaim is **granted**.

### 5.    Defendants' CUTPA Claim:

The CUTPA states that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a) (LEXIS 2004). In order to determine what is unfair, a court must consider:

(1) [W]hether the practice, without necessarily having been previously considered

unlawful, offend  public policy as it has been established by statutes, the common law, or
otherwise -- whether, in other words, it is within at least the penumbra of some common
law, statutory, or other established concept of unfairness; (2) whether it is immoral,
unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to
consumers [(competitors or other businessmen)]

Web Press Services Corp. v. New London Motors, Inc., 203 Conn. 342, 355, 525 A.2d 57, 65

(1987) (alterations in original).  Thus, a violation of the CUTPA may be established by showing

either an actual deceptive practice ... or a practice amounting to a violation of public policy."  Id.

(citation omitted).

Defendant AWA's Third Counterclaim alleges a violation of the CUTPA when Plaintiffs

filed a letter of protest with the United States Patent and Trademark Office ("PTO") on

December 7, 2001 over Defendant AWA's attempt to register the trademark "Peacekeeper."   In

that letter, Plaintiffs informed the PTO of their registration of the mark "Peacemaker."  Then,

after this lawsuit was filed, Plaintiffs filed a second letter of protest on February 20, 2002

requesting that the application for registration be suspended pending the outcome of this

litigation.  That request was granted and the PTO suspended action on Defendant AWA's

application.  Defendants argue that because Plaintiffs never registered the "Peacekeeper" mark

"their effort to block [Defendant] AWA's registration was in bad faith."  Def. Br. Opp. Summ. J.

at 99.  Defendants also argue, based on the counterclaims concerning false designation of origin

and advertising, that a violation of the Lanham Act is a per se violation of the CUTPA and that

they are therefore entitled to relief under the CUTPA.  Id. at 98.

Plaintiffs move for summary judgment on the basis that their actions are simply not

actionable under the CUTPA as they do not involve immoral, unethical, or unfair behavior which

violates any public policy or damages consumers.  Pl. Br. Supp. Summ. J. at 54-56.  Plaintiffs

68

argue they were simply following standard procedure under PTO regulations. Id. at 55. Plaintiffs do not address Defendants other Lanham Act counterclaims as bases for the CUTPA claim, but because summary judgment has already be granted in favor of Plaintiffs on Counterclaims One and Two, there is no need to address them here. Accordingly, the only bases left for a possible CUTPA claim are the letters of protest.

For Defendants to go forward they are essentially asking the Court to find that actions taken in the context of governmental administrative and/or judicial proceeding can constitute unfair methods of competition and unfair, deceptive acts, or practices in the conduct of trade or commerce. Without finding that this would never be possible, it would at least have to amount to more than a simple assertion of what Plaintiffs believe to be their legal rights. See e.g. Suburban Restoration Co. v. ACMAT Corp., 700 F.2d 98, (2d Cir. 1983) ("[T]he filing of a single non-sham lawsuit -- cannot form the basis of a claim under CUTPA..."); Norse Sys. v. Tingley Sys., 49 Conn. App. 582, 596, 715 A.2d 807 (1998) (Interpreting a CUTPA claim based on an allegedly frivolous lawsuit with the motive to destroy a competitor as a "hybrid" vexatious litigation claim - which requires a lack of probable cause - and tortious interference with a business or contractual relationship claim). Plaintiffs legal action, while certainly not guaranteed to succeed, is not so without base as to be unethical, unfair, or in violation of public policy. Accordingly, without a showing that Plaintiffs' actions amounted to more than an at least colorable attempt to preserve legal rights, of which there is none, there is no basis to assert a CUTPA violation. Plaintiffs' Motion for Summary Judgment on Defendant AWA's Third Counterclaim is **granted**.

6.    Whether the Name "Single Action Army" and the Peacemaker

69

Trade Dress is Generic or Abandoned:

Defendant AWA's Fourth and Fifth Counterclaims allege that the name "Single Action Army" (which in their Amended Complaint Plaintiffs assert is their common law trademark) and the Peacemaker trade dress is generic and/or abandoned.  Defendants arguments on these claims have already been addressed, however, Plaintiffs also move for summary judgment on these issues.  Although Defendants did not establish their right to summary judgment on the question of whether the trade dress is generic, the continued existence of replica makers does raise a question of fact.  See BellSouth Corp., 60 F.3d at 1570 (A mark "may become generic over time through common usage if the otherwise nondescriptive term is not policed as a trademark and it is commonly used to describe a type of product).  Accordingly, Plaintiffs are not entitled to summary judgment on the question of whether their trade dress is generic.  Plaintiffs' Motion is **denied**.

Similarly, the issue of abandonment has been addressed.  Plaintiffs arguments center around the maintenance of secondary meaning during the period of non-production and that secondary meaning in their trade dress did not, as a matter of law, dissipate.  Pl. Br. Supp. Summ. J. at 59.  Plaintiffs certainly raise a question of fact as to whether they maintained secondary meaning, but considered against the plausible claim that the existence of replicas weakened that distinctiveness the issue cannot be resolved on summary judgment.  Accordingly, Plaintiffs' Motion for Summary Judgment on Defendants' Fourth and Fifth Counterclaim on abandonment is **denied**.  Parties are, however, cautioned again that focusing too much on this period of non-production may not bear on any dispositive question of fact or law.

Finally, Plaintiffs argue that they are entitled to summary judgment on Defendants'

counterclaim on the name "Single Action Army."  This argument is curious in that neither parties' briefs contain any particularized discussion of this name.  Plaintiffs' Brief Supporting their Motion focuses on the failure of Defendants' argument about copying to demonstrate that the trade dress is generic, but does not address how this applies to a product name.  It may apply in the same manner, but the argument must be made.  Defendants Opposition Brief not surprisingly also focuses on the "overall appearance" of the trade dress and not the name "Single Action Army."  See Def. Br. Opp. Summ. J. at 71-80.  The same holds true for Defendants' Brief in Support of their Motion.  See Def. Br. Supp. Summ. J. at 60-74.  Plaintiffs have therefore not met their initial burden on summary judgment and their Motion is **denied**.

## IV.    CONCLUSION:

For the reasons stated herein, Plaintiffs' Motion for Summary Judgment [Doc. No.157] is **granted** in part, **denied** in part.  Plaintiffs' Motion is granted with respect to Defendants' acquiescence defense and Defendant AWA' First, Second, and Third Counterclaim.  It is denied with respect to all other issues.  Defendants' Motion for Summary Judgment [Doc. No. 144] is **granted** in part, **denied** in part.  Defendants' Motion is granted with respect to Count Five of Plaintiffs' Amended Complaint and denied with respect to all other Counts.  Additionally, Defendants' Motions to Strike [Doc. Nos. 186 and 193] are **denied**.

SO ORDERED.

Dated at New Haven, Connecticut, March  29 , 2004.

/s/
_____
Peter C. Dorsey, U.S. District Judge
United States District Court

71